SIGMA CORPORATION, Southern Star, Inc., City Pipe and Foundry, Inc., and Long Beach Iron Works, Inc.; Overseas Trade Corporation; Guangdong Metals & Minerals Import & Export Corporation; U.S. Foundry & Manufacturing Co., Alhambra Foundry, Inc., Allegheny Foundry, Co., Bingham & Taylor Division, Virginia Industries Inc., Charlotte Pipe & Foundry Co., Deeter Foundry Inc., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Tyler Pipe Industries, Inc., and Vulcan Foundry, Inc., Plaintiffs,

U.V. International, Plaintiff-intervenor,

v.

UNITED STATES, Defendant,

Guangdong Metals & Minerals Import & Export Corporation; U.S. Foundry and Manufacturing Co., et al., Defendant-intervenors.

No. 92–04–00283.
Slip Op. 93–238.

United States Court of International Trade.

Dec. 20, 1993.

Willkie Farr & Gallagher (Walter J. Spak, Christopher Dunn, Christopher S. Stokes, Theodore C. Whitehouse and James P. Durling), Washington, DC, for plaintiffs Sigma Corp., Southern Star, Inc., City Pipe and Foundry, Inc. and Long Beach Iron Works and plaintiff-intervenor U.V. Intern.

Mudge Rose Guthrie Alexander & Ferdon, N. David Palmeter, Jeffrey S. Neeley and Richard G. King, Washington, DC, for plaintiff Overseas Trade Corp.

Whitman & Ransom, Dennis James, Jr. and Kathleen F. Patterson, Washington, DC, for plaintiff and defendant-intervenor Guangdong Metals & Minerals Import & Export Corp.

Collier, Shannon, Rill & Scott (Paul C. Rosenthal, Mary T. Staley and Robin H. Gilbert), Washington, DC, for plaintiffs and defendants-intervenors U.S. Foundry & Mfg. Co., Alhambra Foundry, Inc., Allegheny Foundry, Co., Bingham & Taylor Division, VA Industries Inc., Charlotte Pipe & Foundry Co., Deeter Foundry Inc., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Mun. Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Tyler Pipe Industries, Inc., and Vulcan Foundry, Inc.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Cynthia B. Schultz, (Jeffery C. Lowe, Atty.-Advisor, Office of Chief Counsel, for Import Admin., U.S. Dept. of Commerce, of counsel), Washington, DC, for defendant.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, Sigma Corporation, *et al.*, move pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record contesting the Department of Commerce, International Trade Administration's ("Commerce") determination in *Final Results of Antidumping Duty Administrative Review: Certain Iron Construction Castings From the People's Republic of China*, 57 Fed.Reg. 10,644 (1992). Specifically, plaintiffs contest Commerce's (1) use of government controlled prices in India for pig iron and scrap, rather than publicly available data; (2) valuation of inland freight; (3) valuation of overhead costs; (4) profit calculation; (5) failure to determine whether the construction castings industry is market oriented; (6) failure to institute reviews for China National Machinery Import and Export Corporation ("MACHIMPEX"), Liaoning, and use of "best information available" for determining foreign market value for MACHIMPEX Liaoning as a non-responsive company; (7) setting of one country-wide dumping margin for all Chinese companies; (8) failure to assign the highest dumping margin to companies that refused to respond to Commerce's request for information; (9) use of import statistics to value scrap steel; and (10) use of Indian coke prices.

On July 6, 1990, Commerce issued a notice of initiation of an administrative review for the period May 1, 1989 through April 30, 1990. *Initiation of Antidumping and Countervailing Duty Administrative Reviews ("1989–90 Initiation")*, 55 Fed.Reg. 27,859 (1990). Commerce subsequently issued its preliminary results of this review on August 2, 1991. *Preliminary Results of Antidumping Duty Administrative Review: Certain Iron Construction Castings From the People's Republic of China ("Preliminary Results")*, 56 Fed.Reg. 37,074 (1991). The Final Results were issued on March 27, 1992. *Final Results*, 57 Fed.Reg. at 10,644. Oral Argument was heard in this case on July 20, 1993.

### Discussion

In reviewing a final determination of Commerce, this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is "not within the Court's

domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir. 1990).

### 1. *Use of Indian Pig Iron and Scrap Prices*

■ Plaintiffs, Sigma Corporation, Southern Star, Inc., City Pipe and Foundry, Inc. and Long Beach Iron Works, Inc. ("Sigma") and plaintiff-intervenor, U.V. International ("UV"), claim that Commerce's valuation of Chinese pig iron and scrap iron using Indian pig iron and scrap iron prices provided by an Indian producer was unsupported by substantial evidence on the record and not in accordance with law. *Brief in Support of Plaintiffs' (Sigma's) and Plaintiff–Intervenor's Motion for Judgment Upon the Agency Record ("Sigma Motion")* at 7. Sigma and U.V. further claim that Commerce ignored the extensive involvement of the Indian government in the industry and the fact that Indian pig iron and scrap prices were not fair market prices. *Id.*

Plaintiff, Guangdong Metals & Minerals Import & Export Corporation ("Guangdong Minmetals"), also claims that Commerce's use of domestically produced Indian pig iron to value Guangdong Minmetals' pig iron was unreasonable. *Plaintiff Guangdong Minmetals' Memorandum of Points and Authorities in Support of its Rule 56.1 Motion for Judgment on the Agency Record ("Guangdong Minmetals Memorandum")* at 10.

Sigma and UV claim that the prices used by Commerce to value pig iron and scrap were not market driven. *Sigma Motion* at 7. The statute clearly states that prices must be market driven. According to 19 U.S.C. § 1677b(c)(1), "the valuation of the factors of production shall be based on the best available information regarding the values of [the factors of production] in a market economy country or countries considered to be appropriate by the administering authority."

Sigma states that the International Trade Commission has found that the Indian government controls the foreign trade of pig iron and scrap in India. "Imports of pig iron

and scrap are routed through the official agencies, Steel Authority of India Ltd. (SAIL) and Metal Scrap Trade Corp. Ltd. (MSTC), respectively." Administrative Record ("AR") (Pub.) Docs. 51 at 5, 53 at 6.

Sigma also claims that the Indian government's involvement in the pig iron and scrap market is further demonstrated by the International Price Reimbursement Scheme ("IPRS"). *Sigma Motion* at 10. Commerce's reviews of the countervailing duty on Indian castings found that the IPRS provided a subsidy to India's castings exporters because the IPRS rebated "the difference between higher domestic and lower international prices" of pig iron. *See Preliminary Results of Countervailing Duty Administrative Review: Certain Iron–Metal Castings From India,* 55 Fed.Reg. 46,699, 46,700 (1990).

The Indian IPRS has also been subject to decision by this court in which Commerce defended its determination that the program granted a subsidy to Indian castings exporters. *See RSI (India) Pvt., Ltd. v. United States,* 12 CIT 331, 687 F.Supp. 605, (1988) *aff'd,* 876 F.2d 1571 (Fed.Cir.1989).

This Court has stated that "Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices. . . . In fact, Commerce repeatedly has failed to base foreign market value upon surrogate countries' prices for exports if those exports may benefit from subsidies or are being dumped." *Tehnoimportexport, UCF America Inc. v. United States,* 16 CIT ——, ——, 783 F.Supp. 1401, 1405 (1992).

Indian castings and the Indian IPRS have also been the subject of dumping investigations by Commerce. *See Certain Welded Carbon Steel Standard Pipes and Tubes From India; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 54,360 (1992); *Certain Iron Construction Castings From India; Final Determination of Sales at Less Than Fair Value ("Iron Construction Castings"),* 51 Fed.Reg. 9,486 (1986).

Commerce's determination as to this issue in *Iron Construction Castings* was affirmed

by the court in *Alhambra Foundry Co. v. United States,* 12 CIT 1110, 1115, 701 F.Supp. 221, 224–25 (1988), in which the court concurred that "Commerce found that IPRS payments were directly related to export sales . . . and decreased the manufacturer's cost of producing the exported merchandise."

Defendant, however, disagrees with plaintiffs claiming that Commerce properly relied upon the actual domestic prices in India to value pig iron and scrap iron. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Administrative Record ("Defendant's Memorandum")* at 12.

In its Final Results, Commerce stated:

To value a NME producer's factor of production . . . the Act requires that the Department utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries. The Department has interpreted this provision to mean that only prices or costs of factors produced in a market-economy country can be used for factor evaluation purposes. . . . The Department has consistently refused to base FMV upon surrogate countries' prices for exports if those exports may benefit from subsidies or are being dumped. . . . The situation in this case is clearly different, however. There is no foundation in the statute, regulations, or in Departmental practice for rejecting domestic prices in a market economy on the basis that the government somehow influences those prices. . . . Given that we have information on the price for pig iron and scrap iron by an Indian castings producer, we have no reason to consider alternative valuation sources.

*Final Results,* 57 Fed.Reg. at 10,645.

The Court, however, is not convinced by the government's arguments. Commerce has not adequately refuted plaintiffs' allegations of subsidies and government involvement in the industry. Therefore, this case is remanded to Commerce to reconsider its use of Indian pig iron and scrap iron prices to value Sigma's and Guangdong Minmetals' foreign market value.

## 2. *Inland Freight Calculations*

■ Sigma, UV and Guangdong Minmetals also claim that Commerce's calculation of inland freight was unlawful because it did not accurately reflect the market-oriented costs applicable in the People's Republic of China. *Sigma Motion* at 14; *Guangdong Minmetals Memorandum* at 22. Sigma and UV claim that inland freight was calculated using data zone rates based on the distances shipped in India and that this is not reflective of the shipping distances in the People's Republic of China. *Sigma Motion* at 14. Guangdong Minmetals claims that Commerce overstated the actual freight costs and that it should have calculated a per-kilometer cost for shipment by rail or truck and should then have applied that figure to the actual distances traveled. *Guangdong Minmetals Memorandum* at 24. Guangdong Minmetals reported the actual distances that the castings and raw materials were shipped within China as well as the mode of transportation. Guangdong Minmetals purchased the merchandise from four factories. The castings were shipped between 10 and 229 kilometers to the ports by truck or by train. *See* AR (Pub.) Doc. 14 at 4.

Commerce states that in calculating inland rail freight rates it relied upon information provided to it by the United States Embassy in India in the 1987–88 administrative review involving cotton shop towels from the People's Republic of China. AR (Pub.) Doc. 72. Commerce further claims that plaintiffs are incorrect by insinuating that the price should have been divided into the maximum number of kilometers applicable to that particular zone. In its Final Results, Commerce stated that there "is no evidence that realistic per-kilometer rates could be calculated by dividing the same rates by the maximum number of kilometers to which each zone rate applies." *Final Results,* 57 Fed.Reg. at 10,645.

The situation in this case is similar to that in *Sigma Corp., et al. v. United States,* 17 CIT ——, 841 F.Supp. 1255, (1993), in which plaintiff Deeter Foundry, *et al.* claimed that Commerce erred in failing to make proper adjustments for inland freight costs incurred to transport raw materials to the foundries.

*Id.* at ——, 841 F.Supp. at 1272. To value pig iron, scrap iron and coke, Commerce relied on Philippine import statistics. *Id.*

The Court in *Sigma* stated that Commerce "ignored actual data submitted by respondents. The data they submitted might have been more difficult to use and it is easy to forsake actual data for best information available, but this investigative tool is often used too freely." *Id.* at —— – ——, 841 F.Supp. at 1273.

The primary purpose of the best information available statute is to provide Commerce with a means of conducting its investigation when a party "refuses or is unable to produce information requested in a timely manner and in the form required" or when a party "otherwise significantly impedes an investigation." *See* 19 U.S.C. § 1677e(b). This was not the case here. Actual data was on the record in this case and Commerce should have used it. Therefore, this case is remanded to Commerce to recalculate freight costs using the information on record which was submitted by respondents.

### 3. *Overhead Costs*

■ Sigma, UV and Guangdong Minmetals also claim that in its calculations Commerce used an inflated overhead value that was unsupported by the record. *Sigma Motion* at 14; *Guangdong Minmetals Memorandum* at 25. Specifically, Sigma claims that Commerce inflated overhead costs by using the cost breakdown for large Pakistani foundries. *Sigma Motion* at 15.

Commerce claims that it lacked information from India regarding factory overhead expenses and, therefore, relied on information from Pakistan. *Defendant's Memorandum* at 56. Commerce states that it relied on two types of data from Pakistan. First, Commerce obtained a rounded estimate stating the following:

16. FACTORY OVERHEAD: Overheads at small units, inclusive of profit and tax fall at 20 to 30 percent. At large foundries, however, factory overheads are 40 to 50 percent. Large foundries charge plant and machinery depreciation at 10 percent per year.

AR (Pub.) Doc. 72.

Second, Commerce received a detailed cost breakdown on a per metric basis for "a large Lahore based foundry." *Id.* After adding up the relevant costs, Commerce "calculated factory overhead expense as a percentage of the total for materials, labor, and energy." *Id.* Commerce reached a percentage of 23.75 percent. *Id.*

Plaintiffs claim that this rate is inflated, yet plaintiffs offer no evidence contradicting the figure arrived at by Commerce. Sigma claims that the overhead in small foundries in Pakistan "is roughly 50 percent of the overhead in large factories." *Sigma Motion* at 16. Furthermore, Sigma fails to substantiate its claim on the record leaving its contentions to mere speculation. Commerce calculated its rate based "on actual costs, rather than estimates." *Final Results*, 57 Fed.Reg. at 10,645. Therefore, Commerce's determination as to this issue is hereby affirmed.

### 4. *Profits*

■ Sigma, UV and Guangdong Minmetals further contest Commerce's valuation of profits using the figures from one foundry in India. They claim that these profits were overstated and were unsupported by substantial evidence on the record. *Sigma Motion* at 16; *Guangdong Minmetals Memorandum* at 26.

In its Final Results, Commerce stated that it is required to "value profit in a surrogate country, provided that the surrogate's profit percentage exceeds the statutory minimum of eight percent. In this instance, the surrogate producer's profit was reported to be 10 percent of total costs. We used this figure since it exceeded the statutory minimum." *Final Results*, 57 Fed.Reg. at 10,645.

Plaintiffs claim that the ten percent rate is not representative since it was based on only one company. *Guangdong Minmetals Memorandum* at 27. Commerce explains, however, that it attempted to elicit information from other Indian companies, but only one firm, Machineworks International, Ltd., re-

sponded and it stated that the rate was ten percent. AR (Pub.) Doc. 72.

According to 19 U.S.C. § 1677b(e)(1), the constructed value of imported merchandise shall be the sum of—

. . . . .

(B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade, except that—

. . . . .

(ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost.

In this case, Commerce acted reasonably since the 10 percent it used was "not less than 8 percent," which was within the confines of the statute. Therefore, Commerce's determination as to this issue is affirmed.

### 5. Market–Oriented Industry

■ Sigma and UV also claim that Commerce impermissibly used a surrogate country in calculating foreign market value rather than first determining whether the construction castings industry was market oriented. *Sigma Motion* at 17.

Commerce, however, claims that Sigma and UV failed to exhaust their administrative remedies regarding this issue and, therefore, cannot bring this issue up now. *Defendant's Memorandum* at 59.

The court has stated that "[a] litigant may not raise an issue for the first time on appeal." *See Cemex, S.A. v. United States*, 16 CIT ——, ——, 790 F.Supp. 290, 296 (1992); *see also Sigma Corp.*, 17 CIT at ——, 841 F.Supp. at 1261; *Wieland Werke, AG v. United States*, 13 CIT 561, 567, 718 F.Supp. 50, 55 (1989). The court "usurps the agency's function when it sets aside a determination upon a ground not previously presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Wieland Werke*, 13 CIT at 567, 718 F.Supp. at 55;

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

In the underlying proceeding, Sigma never contended that the castings industry was market oriented and, therefore, Commerce did not have the opportunity to consider the merits of this claim or seek any factual information.

■ The court has recognized several exceptions to the exhaustion requirement. For example, if a party does not have access to the confidential record or it would be futile to raise an argument at the administrative level, then a plaintiff is not required to exhaust its administrative remedies. *See Budd Co. Wheel & Brake Div. v. United States*, 15 CIT 446, 452–53, 773 F.Supp. 1549, 1554–55 (1991); *see also Rhone Poulenc, S.A. v. United States*, 7 CIT 133, 583 F.Supp. 607 (1984).

In a related case, *Sigma Corp.*, 17 CIT at ——–——, 841 F.Supp. at 1260–61, the Court similarly did not address plaintiffs arguments on this issue since they failed to exhaust their administrative remedies. The Court in this case is likewise not in a position to entertain plaintiffs' arguments as plaintiffs have failed to exhaust their administrative remedies on this issue and, therefore, this Court denies plaintiffs' motion to remand this case to Commerce so that it can determine whether the construction castings industry in the People's Republic of China is market oriented.

### 6. Exclusion of Liaoning

■ Plaintiff Overseas Trade Corporation ("Overseas") is an American owned company located in Seattle, Washington. During the period of review in question in this case, Overseas purchased iron construction castings from one Chinese company, China National Machinery Import and Export Corporation ("MACHIMPEX"), Liaoning. Overseas claims that Commerce's failure to name MACHIMPEX Liaoning in its requests for reviews and its failure to institute reviews for that company was unsupported by substantial evidence. *Plaintiff Overseas Trade Corporation's Brief in Support of its Motion for*

*Judgment Upon the Agency Record ("Overseas Brief")* at 13.

Overseas claims that during the periods of review, MACHIMPEX Liaoning was a separate and distinct company from other companies bearing the MACHIMPEX name. Indeed, at one time, Liaoning was connected with the national headquarters in Beijing, but Overseas contends that this is no longer the case.

On May 25, 1990, counsel for the Municipal Castings Fair Trade Council ("MCFTC") requested Commerce to institute an administrative review of certain companies for the 1989–90 review period. AR (Pub.) Doc. 2. In its subsequent notice of initiation of antidumping and countervailing duty administrative reviews, Commerce named the companies it was reviewing including the Beijing branch of Minmetals, the Guangdong branch of Minmetals, the Liaoning branch of Minmetals, the Jilin branch of Minmetals, the Anhui branch of Minmetals and MACHIMPEX. *1989–90 Initiation,* 55 Fed.Reg. 27,859. On July 26, 1990, Commerce directed the sending of questionnaires to these firms. AR (Pub.) Doc. 7. No such questionnaire was sent to MACHIMPEX Liaoning. In a letter dated August 17, 1990, however, MACHIMPEX Beijing acknowledged receipt of its questionnaire, stating that all the former branches are now independent from MACHIMPEX Beijing. The letter stated:

> As all the former branches are independent now from China National Machinery Import & Export Corporation (CMC), CMC is no longer the responder of the said questionnaire. However, in order to cooperate with you, we have already sent the questionnaire to Liaoning Machinery Import & Export Corporation (LMIEC) for their prompt response according to your letter.

AR (Pub.) Doc. 8.

On August 2, 1991, Commerce published its Preliminary Results for iron construction castings from the People's Republic of China for this period. *Preliminary Results,* 56 Fed.Reg. 37,074. Commerce calculated a dumping margin of 63.28% for Guangdong Minmetals. However, in calculating the margins for MACHIMPEX, Commerce relied on "best information available" and applied this rate to all corporations bearing the MACHIMPEX name, including MACHIMPEX Liaoning. *Id.*

Plaintiff Overseas now claims that MACHIMPEX Liaoning cannot be subject to these rates since it was a separate company from MACHIMPEX, and was not identified as a respondent by petitioner. Overseas claims that since it had no idea that it was subject to the review that its duties should be assessed at the 11.66% deposit rate that it paid upon importation. *Overseas Brief* at 15.

Defendant claims, however, that notification of the review and servicing of questionnaires was sent to MACHIMPEX headquarters in Beijing and that MACHIMPEX and all its branches had been subject to antidumping procedures since 1985 and they should have been familiar with Commerce's procedures. *Defendant's Memorandum* at 34–36.

In determining whether substantial evidence supports Commerce's determination that plaintiffs were not independent from the national headquarters, the exporter must affirmatively demonstrate "an absence of central government control, both in law and in fact, with respect to exports." *Final Determinations of Sales at Less Than Fair Value: Sparklers From the People's Republic of China ("Sparklers From PRC"),* 56 Fed.Reg. 20,588, 20,589 (1991).

Evidence supporting *de jure* absence of central control includes: (1) absence of restrictive stipulations on individual exporter's business and export licenses; (2) legislative enactments decentralizing control of companies; or (3) formal measures by the government decentralizing control of the companies. *Tianjin Machinery Import & Export Corp. v. United States,* 16 CIT ——, ——, 806 F.Supp. 1008, 1014 (1992). *De facto* absence of central government control should meet two prerequisites: (1) each exporter sets its own export prices independently of the government and other exporters; and (2) each exporter keeps the proceeds from its sales. *Id.*

In *Tianjin Machinery,* the court ruled that plaintiffs were not independent legal entities on the grounds that they failed to prove their independence. *Tianjin Machinery,* 16 CIT at ——, 806 F.Supp. at 1014–15. In *Tianjin Machinery,* however, plaintiffs were aware that they were subject to the review, and they were served with questionnaires that were completed. In the case at hand, Liaoning was not afforded with this opportunity.

To add insult to injury, Commerce applied the "best information available" rule to Liaoning as an unresponsive company to calculate a dumping margin. *Overseas Brief* at 15. Overseas claims that Commerce's application was unsupported by substantial evidence since no review was requested of Liaoning and no questionnaire was served directly on that company. *Id.*

According to 19 U.S.C. § 1677e(c) (1988 & Supp.1993):

**Determinations to be made on best information available**

In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

Thus, the statute states that Commerce is authorized to use best information available when a party is unable or does not provide Commerce with the necessary information with which to make its determination. *Id.* In this case, Liaoning never refused and was never unable to supply the information. They did not respond since they were not given adequate notice that they were subject to review. *See Sigma Corp.,* 17 CIT at ——, ——, 841 F.Supp. at 1263–64.

In *Sigma Corp.* the Court held that adequate notice was not given to MACHIMPEX Liaoning that it was subject to a prior review and, therefore, the Court ordered the assessment of duties at the 11.6% deposit rate that

it paid upon importation. *Id.* at ——, 841 F.Supp. at 1264.

Furthermore, the MCFTC's request in both cases was not clear and understandable from the record. This court has held that there is "a burden on the party making the request to submit a clear, understandable and comprehensive request within the deadline set by the regulation." *Floral Trade Council v. United States,* 13 CIT 142, 144, 707 F.Supp. 1343, 1344–45, *aff'd,* 888 F.2d 1366 (Fed.Cir.1989). It is clear to the Court in this case that the request was not clear, understandable and comprehensive. The request clearly did not list MACHIMPEX Liaoning. It merely listed MACHIMPEX and not any of its branches. It did, however, list several branches of Minmetals which gives rise to the presumption that if Liaoning was to be included it would have been separately listed.

Granted, Commerce is not required to search out all subsidiaries of every company it reviews, but under the circumstances of this case, the Court cannot in all fairness deem MACHIMPEX Liaoning as within the scope of this review. Parties "have an obligation to be precise in their requests thereby affording companies adequate notice to defend their interests." *Sigma Corp.,* 17 CIT at —— – ——, 841 F.Supp. at 1263–64. In this case, adequate notice was not given and, therefore, Overseas' motion for judgment on the agency record regarding this issue is granted and its duties are to be assessed at the 11.66% deposit rate that it paid upon importation.

### 7. *Country–Wide Rate v. Individual Rate*

Overseas further claims that Commerce erred in setting one average dumping margin for all Chinese companies. *Overseas Brief* at 18. This issue is now moot, however, since the Court has ruled in the preceding section of this opinion that this case is remanded to Commerce to assess duties against MACHIMPEX Liaoning at the 11.66% deposit rate that it paid upon importation.

### 8. *Highest Dumping Margin*

■ Plaintiffs U.S. Foundry & Manufacturing Co., Alhambra Foundry, Inc., Alleghe-

ny Foundry, Co., Bingham & Taylor Division, Virginia Industries Inc., Charlotte Pipe & Foundry Co., Deeter Foundry Inc., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Tyler Pipe Industries, Inc. and Vulcan Foundry, Inc. ("U.S. Foundry") claim that Commerce erred by failing to apply the highest available dumping margin to those Chinese companies that refused to respond to Commerce's questionnaire. *U.S. Foundry's Memorandum of Points and Authorities in Support of Motion for Judgment Upon the Agency Record ("U.S. Foundry Memorandum")* at 8. U.S. Foundry's argument is based on the assertion that the companies failed to respond because, based on the preliminary results of previous reviews, they anticipated their calculated margins would be higher than the margin of the sole responding company, Guangdong Minmetals. Therefore, plaintiffs argue that to use the margin calculated for Guangdong Minmetals is in essence insufficiently punitive. *Id.*

Commerce states that it relied upon the highest rate found for any firm in the current review or any prior review as best information available. *Final Results,* 57 Fed.Reg. at 10,646. Specifically, Commerce assigned to non-responding companies the margin it assigned to Guangdong Minmetals (92.74%), which happened to be the highest margin assigned during this review since Guangdong Minmetals was the only responding company. *Id.* at 10,648.

U.S. Foundry now claims that Commerce failed to apply the highest usable rate to the foreign producers who did not respond to the Department's questionnaire. U.S. Foundry claims that Commerce should have used the highest dumping margin used on any one sale during the course of this review or, alternatively, U.S. Foundry asserts that Commerce should have used the highest average margin for one of the four separate foundries in Guangdong Minmetals' response. *U.S. Foundry Memorandum* at 15.

Commerce, on the other hand, claims that U.S. Foundry presumes these other margins were usable when they were not. *Defendant's Memorandum* at 48. Commerce adds

that it considered these suggested rates, but they were "overly speculative and unacceptable." *Id.* at 48–49.

The primary purpose of the best information available statute is to provide Commerce with a means of conducting its investigation when a party "refuses or is unable to produce information requested in a timely manner and in the form required" or when a party "otherwise significantly impedes an investigation." *See* 19 U.S.C. § 1677e(c).

In its Final Results, Commerce stated:

[W]e have followed our normal BIA policy for noncooperative parties which states that we will generally assign the higher of: (a) The highest rate for any firm for any previous review or the original less-than-fair-value investigation, or (b) the highest rate found for any firm in the current review.

*Final Results,* 57 Fed.Reg. at 10,646.

In *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185 (Fed.Cir.1993), the Court of Appeals for the Federal Circuit ratified Commerce's two-tier BIA methodology stating that the

two-tier methodology adopted by the ITA and used in its administrative review of antidumping duty orders is a reasonable and permissible exercise of the ITA's statutory authority to use the best information available when a respondent refuses or is unable to provide requested information.

*Id.* at 1192.

The court further stated that "because Congress has 'explicitly left a gap for the agency to fill' in determining what constitutes the best information available, the ITA's construction of the statute must be accorded considerable deference." *Id.* at 1191 (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)).

Thus, since Commerce reasonably utilized the two-tier system in this case, which has been affirmed by the Federal Circuit, this Court hereby affirms Commerce's selection of best information available in the case at hand.

### 9. *Price for Scrap Steel*

 Plaintiffs, U.S. Foundry, *et al.,* also claim that Commerce erroneously relied on Indian import statistics to value scrap steel rather than more accurate information which was readily available to it. *U.S. Foundry Memorandum* at 25. Specifically, U.S. Foundry claims that Commerce should have relied on actual market prices for scrap steel from Pakistan. *Id.* at 18.

In its determination, Commerce relied on Indian import statistics for scrap steel rather than actual market prices for scrap steel from Pakistan. *Final Results,* 57 Fed.Reg. at 10,646. Commerce states that it is its policy to rely upon a single surrogate country whenever possible. *Defendant's Memorandum* at 31.

The Court repeatedly has affirmed Commerce's use of import statistics. *See Sigma Corp.,* 17 CIT at ——, 841 F.Supp. at 1260; *Tehnoimportexport and Peer Bearing Co. v. U.S.,* 15 CIT 250, 256, 766 F.Supp. 1169, 1176; *Tehnoimportexport, UCF America Inc. v. United States,* 16 CIT ——, 783 F.Supp. 1401 (1992). Furthermore, "[t]here is no statutory or case law stating that import [statistics] cannot be used." *Tehnoimportexport,* 16 CIT at ——, 783 F.Supp. at 1405.

Therefore, the Court deems Commerce's decision to use import statistics in this instance as reasonable and this issue is hereby affirmed.

### 10. *Official Coke Prices*

 U.S. Foundry further claims that Commerce's use of the Indian "official" coke price was not reasonable given conflicting information in the record about the proper value for coke. *U.S. Foundry Memorandum* at 22. U.S. Foundry claims that Commerce relied on an "official" Indian price for coke even though the United States Consulate specifically indicated that the price did not reflect market conditions. *Id.* at 23.

In its Final Results, Commerce stated:

For the preliminary results, we valued coke based on the price the American Consulate in Calcutta provided of 1,800 rupees per metric ton. As a result of petitioner's

comment, we asked the consulate to confirm the accuracy of the price quote. In response, the consulate advised that the correct price was 1,100 rupees per metric ton.

In consideration of this information, we based the valuation of coke on the confirmed price of 1,100 Indian rupees.

*Final Results,* 57 Fed.Reg. at 10,646.

U.S. Foundry claims that information obtained from the United States Embassy in Pakistan should have been used because it was more accurate. *U.S. Foundry Memorandum* at 22. U.S. Foundry specifically cites to a telex from the United States Consulate in India on the administrative record which sheds light on the matter. The telex states that "[t]he official price of hard coke for industrial use was Rs. 1,100 per metric ton at the time of reporting. However, the market price for coke varies on a day-to-day basis and is usually substantially higher than the official price." AR (Pub.) Doc. 61.

 Nevertheless, Commerce did select the lower rate. U.S. Foundry objects and claims that an even lower Pakistani rate is more accurate. The Court is not convinced. The information used by Commerce in this instance was received directly from the American Consulate in Calcutta. When Commerce is faced with two alternatives, it may select either one as long as the one selected is reasonable. *See Tehnoimportexport,* 16 CIT at ——, 783 F.Supp. at 1404; *Novachem, Inc. v. United States,* 16 CIT ——, ——, 797 F.Supp. 1033, 1037 (1992). The Court deems Commerce's selection of information in this instance as reasonable and, therefore, Commerce's determination as to this issue is affirmed.

### *Conclusion*

In accordance with the foregoing opinion, plaintiffs' motion for judgment on the agency record is granted in part and this case is remanded to Commerce to (1) reconsider its use of Indian pig iron and scrap iron prices to calculate Sigma's and Guangdong's foreign market value, (2) recalculate freight costs using the information on the record which was submitted by respondents, and (3) assess

duties against MACHIMPEX Liaoning at the 11.66% deposit rate that it paid upon importation.

Plaintiffs' motion is denied in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Comments to remand results are due thirty (30) days thereafter. Responses to comments are due within fifteen (15) days of the date comments are due.