UCF AMERICA INC. and Universal Automotive Co., Ltd., Plaintiffs,

v.

UNITED STATES, Defendant,

and

The Timken Company, Defendant–Intervenor.

Court No. 92–01–00049.

United States Court of International Trade.

Dec. 5, 1994.

Venable, Baetjer, Howard & Civiletti, John M. Gurley and Lindsay B. Meyer, Washington, DC, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Patricia L. Petty, of counsel: Edward Reisman and Mary P. Michel, Attorney–Advisors, Of-

fice of the Chief Counsel for Import Adm'n, U.S. Dept. of Commerce, Washington, DC, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, Charles A. St. Charles and James R. Cannon, Jr., Washington, DC, for defendant-intervenor, The Timken Co.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, UCF America Inc. and Universal Automotive Co., Ltd., challenge the affirmative determination of the United States Department of Commerce, International Trade Administration ("Commerce"), in *Final Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof From the People's Republic of China ("Final Results")*, 56 Fed.Reg. 67,590 (1991). This action comes before the Court on plaintiffs' motion for judgment on the administrative record pursuant to Rule 56.1 of the Rules of this Court.

### Background

On August 25, 1986, The Timken Company ("Timken"), a U.S. domestic producer of tapered roller bearings and parts ("TRBs"), petitioned Commerce for an investigation alleging that TRBs from the People's Republic of China (the "PRC") were being, or were likely to be, sold in the United States at less than fair value ("LTFV"). In response, Commerce initiated an antidumping investigation of China National Machinery & Equipment Import and Export Corporation

("CMEC"), an exporter of TRBs from the PRC, and of Premier Bearing & Equipment, Ltd. ("Premier"), a Hong Kong-based trading company that exports PRC-produced TRBs to the United States. *Tapered Roller Bearings, Rollers and Parts Thereof, Finished or Unfinished, From the People's Republic of China; Initiation of Antidumping Duty Investigation*, 51 Fed.Reg. 33,283 (1986). CMEC and Premier accounted for all sales of TRBs from the PRC. *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China; Preliminary Determination of Sales at Less than Fair Value ("LTFV Investigation Preliminary Results")*, 52 Fed.Reg. 3,833 (1987).

On May 27, 1987, Commerce issued its final affirmative determination of sales at LTFV and confirmed its preliminary finding that the PRC is a state-controlled-economy country. Commerce found no dumping margin for CMEC, but established a margin for Premier and set an "all others" rate of 0.97% for all other TRB exporters not specifically reviewed. *Tapered Roller Bearings From the People's Republic of China; Final Determination of Sales at Less Than Fair Value ("LTFV Investigation Final Results")*, 52 Fed.Reg. 19,748 (1987). On June 15, 1987, Commerce published an antidumping duty order covering the unfairly traded merchandise. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China* (the "Order"), 52 Fed.Reg. 22,667 (1987) ("the Order").[1]

---

1. The first administrative review of the Order encompassed only Premier. *Initiation of Antidumping Duty Administrative Reviews*, 53 Fed. Reg. 28,423 (1988).

On July 25, 1989, Commerce initiated a second administrative review, intending to review Premier, CMEC, and the following nine Chinese factories from which CMEC purchased TRBs: Harbin Bearing Factory ("Harbin"), Luoyang Bearing Factory ("Luoyang"), Yantai Bearing Factory ("Yantai"), Xiang Yang Bearing Factory ("Xiang Yang"), Guiyang Bearing Factory ("Guiyang"), Northwest Bearing Plant ("Northwest"), Hai Lin Bearing Factory ("Hai Lin"), Haihong Bearing Factory ("Haihong"), and Yishan Bearing Factory ("Yishan"). *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 54 Fed.Reg. 30,915 (1989). Commerce retracted this decision however because it lacked

authority to conduct an administrative review as the antidumping duty order had not been issued on CMEC because its margin was on appeal to the Court of Appeals for the Federal Circuit ("CAFC"). In a related move, Commerce retracted with regard to the nine factories from which CMEC purchased TRBs. *Tapered Roller Bearings From the People's Republic of China; Rescission of Initiation of Administrative Review ("Recision of Initiation of the Second Administrative Review")*, 54 Fed.Reg. 41,480 (1989).

Commerce's preliminary results for the first and second administrative reviews excluded CMEC because the dumping order for CMEC was not published until February 26, 1990. *Preliminary Results of Antidumping Duty Administrative Reviews: Tapered Roller Bearings and Parts Thereof From the People's Republic of China*, 55 Fed.Reg. 41,735 (1990).

On October 18, 1988, the United States Court of International Trade remanded certain aspects of the LTFV Investigation Final Results to Commerce for redetermination. *Timken Co. v. United States,* 12 CIT 955, 699 F.Supp. 300 (1988). Commerce's remand determination amended the LTFV Investigation Final Results, establishing a margin for CMEC.

Subsequently, the CAFC upheld CMEC's margin and on February 26, 1990, Commerce published an amended antidumping duty order covering Premier, CMEC, and establishing an "all others" rate of 2.96%. *Tapered Roller Bearings From the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance with Decision Upon Remand,* 55 Fed.Reg. 6,669 (1990).

On June 29, 1990, Timken requested that Commerce conduct an annual administrative review of the antidumping duty order on TRBs from the PRC with respect to CMEC, Premier, Shanghai General Bearing Co., Ltd. ("Shanghai General"), Shanghai Roller Bearing Factory ("Shanghai Roller"), Harbin, Luoyang, Yantai, Xiang Yang, Guiyang, Northwest, Hai Lin, Haihong, and Yishan. P.R. Document No. 3 at 29–30.[2]

On July 26, 1990, Commerce initiated this third administrative review, naming only Premier and CMEC. *Initiation of Antidumping Duty Administrative Reviews* ("*Notice of Initiation*"), 55 Fed.Reg. 30,490 (1990).

On October 4, 1991, Commerce preliminarily established company-specific dumping margins for Premier, CMEC, Guizhou Machinery Import and Export Corporation ("Guizhou"), Henan Machinery and Equipment Import and Export Corporation ("Henan"), Jilin Machinery Import and Export Corporation ("Jilin"), Liaoning Machinery and Equipment Import and Export Corporation ("Liaoning"), Luoyang and Shanghai General, and set an "all others" rate. *Preliminary Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof From the People's*

*Republic of China* ("*Preliminary Results*"), 56 Fed.Reg. 50,309 (1991).

This review covered the period June 1, 1989 through May 31, 1990 for Premier and Shanghai General and from May 12, 1989 to May 31, 1990 for all other companies. Commerce issued its final determination on December 31, 1991, establishing company-specific margins for all of the above named companies and assigning an "all others" rate of 8.83% *ad valorem,* a rate equal to the margin found for Jilin. *Final Results,* 56 Fed.Reg. 67,590.

Against this background, plaintiffs now move pursuant to Rule 56.1 of the Rules of this Court for judgment on the administrative record alleging that Commerce: (1) unlawfully reviewed companies not properly within the scope of this review; (2) incorrectly applied and calculated the "all others" rate; (3) made an arithmetic error in calculating freight costs for Jilin; and (4) erred in using a CIF/FOB (Cost, Insurance and Freight/Free on Board) ratio to increase Indian raw material (steel) costs. Plaintiffs allege that, with respect to the above-enumerated errors, Commerce's Final Results are unsupported by substantial evidence on the record and are not otherwise in accordance with law. *Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Judgment on the Agency Record* ("*Plaintiffs' Brief*") at 3–50.

### Discussion

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

■ This Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated*

---

**2.** Citations to documents contained in the public record of this administrative review are designated "P.R.". Citations to documents contained in the confidential record are designated "C.R.".

*Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### 1. *The Scope of Reviewable Companies*

In the Preliminary Results, Commerce stated:

> During the original investigation of TRBs from the PRC, CMEC was the umbrella organization through which all companies in the PRC exported TRBs to the United States. As such, in reviewing CMEC, we included all PRC companies that exported TRBs to the United States. Given that the Department's current practice is to consider all Chinese companies as one unless evidence to the contrary can be provided, by initiating this review for CMEC and Premier, the Department meant to include all exports of TRBs from the PRC.
>
> In addition to CMEC and Premier, this review includes Guizhou Machinery Import and Export Corporation (Guizhou), Henan Machinery and Equipment Import and Export Corporation (Henan), Jilin Machinery Import and Export Corporation (Jilin), Liaoning Machinery and Equipment Import and Export Corporation (Liaoning), Luoyang Bearing Factory (Luoyang), and Shanghai General Bearing Co., Ltd. (Shanghai General).

*Preliminary Results*, 56 Fed.Reg. 50,309.

Plaintiffs assert that Commerce has unlawfully reviewed companies which were not properly within the scope of this administrative review. Specifically, plaintiffs contend that Commerce should have restricted this review to only Premier and CMEC, as only these two companies were named in Commerce's Notice of Initiation. *Plaintiffs' Brief* at 12–13. In support of this assertion, plaintiffs argue that 19 U.S.C. § 1675(a) (1988) and 19 C.F.R. § 353.22(a) (1991) authorize administrative reviews only of specified individual producers or resellers covered by an antidumping duty order. *Id.* at 11–12.

Alternatively, plaintiffs assert that this review should have encompassed only CMEC, Premier, Shanghai General, Shanghai Roller, Harbin, Luoyang, Yantai, Xiang Yang, Guiyang, Northwest, Hai Lin, Haihong and Yishan, as Timken named only these companies in its request for an administrative review. *Id.* at 7–11. Plaintiffs argue that 19 U.S.C. § 1675(a) requires that a request for review specify the companies sought to be reviewed. For support, plaintiffs rely on *Floral Trade Council v. United States*, 888 F.2d 1366, 1368–69 (Fed.Cir.1989). *Id.* at 17–18.

Commerce refutes plaintiffs' assertions, pointing out that its review of the contested companies was consistent with its policy of regarding all exporters of a non-market economy ("NME") country as a single entity unless the exporters demonstrate their independence so as to warrant company-specific margins. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon Agency Record ("Defendant's Brief")* at 12–13. Commerce maintains that its Preliminary Results clarified the scope of reviewable companies and effectively amended the Notice of Initiation. *Defendant's Brief* at 12. Alternatively, Commerce asserts that, even if CMEC was not the umbrella organization for all direct exports of TRBs, 19 C.F.R. § 353.22(c) (1991) explicitly permits it to self-initiate a review of any firm. *Id.* at 14.

Plaintiffs concede that 19 C.F.R. § 353.22(c) permits reviews on Commerce's own initiative when appropriate. However, they assert that this regulation is inconsistent with the statutory edict of 19 U.S.C. § 1675(a)(1) (1988). *Plaintiffs' Brief* at 20–25.

Commerce denies that any conflict exists between 19 C.F.R. § 353.22(c) and 19 U.S.C. § 1675(a) and argues that neither the language of § 1675(a) nor the legislative history of the 1984 statutory amendments to this provision prohibits Commerce from conducting reviews on its own initiative. *Defendant's Brief* at 13–17.

Plaintiffs argue that, assuming *arguendo*, that self-initiated reviews are lawful, a self-initiated review of unspecified companies was

inappropriate in this case. Essentially, plaintiffs first argue that Timken's sophistication with the review procedure and its familiarity with Chinese exporters qualified it to ably name any PRC TRB exporters it wished reviewed. Second, plaintiffs argue that the legislative history of the 1984 amendments to 19 U.S.C. § 1675(a) indicates that Congress made the statutory transition to reviews upon request in order to ease the burden on Commerce. *See* H.R.Rep. No. 98–1156, 98th Cong., 2d Sess. 181 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4910, 5298. *Plaintiffs' Brief* at 20–26.

■ Subsequent to adverse final determinations by Commerce and by the International Trade Commission, Commerce issues an antidumping duty order to assess antidumping duties on the merchandise which was the subject of the determinations. 19 U.S.C. § 1673d(c)(2) (1988). *See also* 19 C.F.R. § 353.21 (1991). Administrative reviews of the order may be requested annually thereafter pursuant to 19 U.S.C. § 1675(a) which provides in relevant part:

> At least once during each 12–month period beginning on the anniversary of the date of publication of a countervailing duty order under this subtitle or under section 1303 of this title, an antidumping duty order under this subtitle or a finding under the Antidumping Act, 1921, or a notice of the suspension of an investigation, the administering authority, *if a request for such a review has been received and after publication of notice of such review in the Federal Register,* shall—

> . . . . .

> (B) review, and determine ... the amount of any antidumping duty....

19 U.S.C. § 1675(a)(1) (emphasis added). Hence, contrary to plaintiffs' assertion, the statute does not restrict review requests with regard to form. "[T]he burdens on the requester are those caused by the mechanics of triggering the review that is actually desired. In practical terms, these burdens should be minimal." *Floral Trade Council v. United States*, 17 CIT ——, ——, Slip Op. 93–244 at 3, 1993 WL 534598, (Dec. 22, 1993).

Title 19, United States Code, Section 1675(a) is implemented by 19 C.F.R. § 353.22(a)(1), which provides:

> Each year during the anniversary month of the publication of an order ... *an interested party ... may request* in writing *that the Secretary conduct an administrative review of specified individual producers or resellers* covered by an order....

(Emphasis added). This regulation requires that requests specify the individual exporters for whom review is sought. *Floral Trade Council*, 888 F.2d at 1369. In discussing 19 U.S.C. § 1675(a)(1) and 19 C.F.R. § 353.53a(a)(1) (1988), a predecessor of 19 C.F.R. § 353.22(a)(1) (1991), in the context of the 1984 statutory transition to reviews upon request, the court in *Floral Trade* gave weight to Congress' intent to ease the burden on Commerce. *Floral Trade Council*, 888 F.2d at 1369. There is a burden on the party making the request for an administrative review to submit a clear, understandable, and comprehensive timely request. *Floral Trade Council v. United States*, 13 CIT 142, 144, 707 F.Supp. 1343, 1344–45 (1989). The name gathering task is not so burdensome upon requester that it creates a conflict with the statute. *Floral Trade Council*, 17 CIT at ——, Slip Op. 93–244 at 4.

■ There is no question, in the case at bar, that Timken complied with 19 C.F.R. § 353.22(a) and with the spirit of 19 U.S.C. § 1675(a) in enumerating specific companies for review. The question arises whether Commerce properly reviewed companies that were not explicitly named in Commerce's Notice of Initiation.

■ As an initial matter, the Court must state that the statute imposes no burden on Commerce with regard to the form of Commerce's response to requests for annual reviews, other than the requirement that Commerce publish a notice in the Federal Register announcing that a review will be undertaken. *See* 19 U.S.C. § 1675(a)(1). In the case at bar, Commerce published a Notice of Initiation naming CMEC and Premier. Moreover, although this review encompassed companies not specified in Timken's request or in the Notice of Initiation, Commerce's Final Results found that "there were no im-

ports reported in this review for which Timken did not request a review of *either the producer or the exporter. Final Results,* 56 Fed.Reg. at 67,596 (emphasis added). Additionally, the contested companies subsequently received questionnaires prior to the Preliminary Results. *Preliminary Results,* 56 Fed.Reg. at 50,309. Thereafter, Commerce clarified the scope of review in the Preliminary Results with respect to direct exports. *Id.* Hence, the contested companies had adequate notice that they would be included in this administrative review.

Further, the Court cannot say, that in reviewing companies not expressly enumerated in the review request, Commerce increased its burden so immeasurably as to amount to a disregard for the relief afforded it by Congress. The administrative record contains a scant number of inquiries that Commerce made to Chinese officials in an attempt to ascertain the players in the TRB direct exports industry, as well as to clarify their interrelationship. P.R. Document No. 26 at 306; P.R. Document No. 27 at 308; P.R. Document No. 71 at 691–92. The review itself encompasses a mere six direct exporters of TRBs in addition to CMEC. It is also noteworthy that the 1984 statutory amendments to 19 U.S.C. § 1675(a) were intended to eliminate reviews in which interest was lacking. *See* H.R.Rep. No. 725, 98th Cong., 2d Sess. 22–23 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4910, 5149. In the instant case, interest in a comprehensive review of PRC TRB exports to the United States never waned.

Commerce's regulation relating to annual reviews is requester oriented and, likewise, imposes no burden on Commerce. *See* 19 C.F.R. § 353.22(a)(1).

Furthermore, it was Commerce's view from the outset that CMEC, through direct exports, and Premier, through exports of PRC origin, accounted for all sales of TRBs from the PRC. *LTFV Investigation Preliminary Results,* 52 Fed.Reg. at 3,833–34. Commerce's belief that CMEC played a major role in direct exports was demonstrated in Commerce's retraction of its decision to conduct a second review of nine factories. At that time, Commerce stated, "CMEC is

by Chinese law the sole Chinese exporter of the merchandise produced by these factories." *Rescission of Initiation of the Second Administrative Review,* 54 Fed.Reg. at 41,-480. In addition, Commerce had determined early in the investigatory process that the PRC is a state-controlled-economy country. *LTFV Investigation Preliminary Results,* 52 Fed.Reg. at 3,833. Therefore, against this backdrop, even if the Chinese economy had experienced some decentralization since the original investigation, it was not unreasonable for Commerce to name only CMEC and Premier in its Notice of Initiation.

Moreover, Commerce's policy with regard to Nonmarket Economy ("NME") systems is to regard companies as a single entity unless they demonstrate independence from the umbrella company, thereby warranting company-specific margins. In the case at bar, the contested companies all received questionnaires prior to issuance of the Preliminary Results. These companies, therefore, were afforded an opportunity to defend their interests. In fact, they received company-specific margins, apparently because they provided Commerce with substantial evidence affirmatively demonstrating an "absence of central government control, both in law and in fact, with respect to exports." *Final Determinations of Sales at Less Than Fair Value: Sparklers From the People's Republic of China,* 56 Fed.Reg. 20,588, 20,-589 (1991). *See also Tianjin Machinery Import & Export Corp. v. United States,* 16 CIT 931, 935, 806 F.Supp. 1008, 1013–14 (1992). Consequently, these companies suffered no prejudice by their inclusion in this review. *Cf. Sigma Corp. v. United States,* 17 CIT ——, 841 F.Supp. 1255 (1993); *Sigma Corp. v. United States,* 17 CIT ——, 841 F.Supp. 1275 (1993).

For the foregoing reasons, the Court finds that Commerce's inclusion of the contested companies in this review is supported by substantial evidence and is in accordance with law.

### 2. *"All Others" Rate*

 In this administrative review, for all companies not specifically reviewed Commerce determined an "all others" rate of

8.83% *ad valorem*, a rate equal to the dumping margin found for Jilin. *Final Results*, 56 Fed.Reg. at 67,597. Commerce explained the "all others" rate application, stating:

> [W]e have determined that company-specific dumping margins are warranted for the eight companies listed ... *For any other exporters, with entries during the review period, we have assigned an "all others" rate equal to the highest rate for any company in this administrative review. This rate will also be the deposit rate for all companies who have not received an individual rate* in any administrative review or the less than fair value investigation, and are not related to any firms with individual rates.

*Id.* (emphasis added).

> *For assessment purposes, all shippers not individually reviewed in this case will be assessed duties equal to the highest rate for any non-BIA [best information available] reviewed firm, which is the "all others" rate.*

*Id.* at 67,596 (emphasis added).

> [T]he "all others" rate applies to all shippers not receiving individual rates in this review, regardless of when they began exporting.

*Id.* at 67,596–97.

Plaintiffs assert that Commerce's application of the "all others" rate established in this administrative review is not in accordance with 19 C.F.R. § 353.22(e) (1991). *Plaintiffs' Brief* at 29. Plaintiffs argue that all imports from companies not specifically reviewed should be liquidated at either 0.97% or 2.96%, the "all others" rate prevalent during the period of review. *Id.*

Plaintiffs point out that the "all others" rate is prospective in nature and, in reviews, this rate should serve as a basis for setting the cash deposit rate. *Id.* at 30. Plaintiffs maintain that, where the "all others" rate is used to "assess" entries as well as for setting the cash deposit rate, Commerce should calculate the "all others" rate based upon the weighted-average margin of all reviewed companies or based upon any other non-punitive method. Plaintiffs cite to the analysis in *Certain Fresh Cut Flowers From Co-*

*lombia; Final Results of Antidumping Duty Administrative Review and Revocation in Part of the Antidumping Order,* 56 Fed.Reg. 50,554 (1991), in support of a weighted-average methodology. *Plaintiffs' Brief* at 30–34. Plaintiffs contend that Commerce should have used the weighted-average methodology also to establish the rate for cash deposits of estimated duties for future entries of unreviewed companies. *Id.* at 45.

Furthermore, plaintiffs argue that, for purposes of assessing entries not specifically reviewed, Commerce's use of Jilin's 8.83% margin as the "all others" rate is particularly inappropriate because Jilin's margin: (1) is unrepresentative of the margins established in this review, (2) resulted from one sale of a bearing model not exported by any other Chinese exporters during the period of review, and (3) was based on misreported factors of production data, the erroneous nature of which was never amended in the record. *Id.* at 32–40.

Plaintiffs suggest that if Jilin's single transaction were excluded from the "all others" rate calculation, Jilin's rate would be 0.00%. Plaintiffs claim that a 0.00% rate would be consistent with the other margins established in this review as all of the margins here fall below 1.05%. *Id.* at 34–37. Further, plaintiffs suggest that if Jilin's anomalous transaction were eliminated, a weighted-average calculation of all reviewed sales would render a rate of less than 1%, a percentage more reflective of the true antidumping margin. *Id.* at 37. Plaintiffs contend that there is no basis for assuming that Jilin's rate represents the pricing practices of the remaining PRC exporters of TRBs. *Id.* at 31.

In addition, plaintiffs argue that, in using the highest non-BIA rate to establish the "all others" rate for purposes of assessment of duties for unnamed companies, Commerce has departed from its previous administrative practice without providing adequate notice. *Id.* at 40–43.

Commerce maintains that the antidumping statute, its legislative history, and Commerce's regulations are silent regarding the methodology to be used in calculating the "all others" rate and, therefore, the methodology

to be employed in establishing this rate is at Commerce's discretion. *Defendant's Brief* at 18.

Commerce argues that its new determination of the "all others" rate methodology was an interpretive rule which is not subject to the notice and comment provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 553 (1988). *Id.* at 25. However, Commerce points out that it gave adequate notice of its new practice with regard to the calculation and assignment of the "all others" rate prior to the Preliminary Results in *Notice of Final Results of Antidumping Duty Administrative Review: Certain Fresh Cut Flowers From Mexico*, 56 Fed.Reg. 29,621 (1991), as well as in the Preliminary Results. *Defendant's Brief* at 18–19.

The Court resolved this issue in *Federal–Mogul Corp. v. United States*, 17 CIT ——, 822 F.Supp. 782, 784–88 (1993), and adheres to that decision based on the rationale stated therein. *See also Federal–Mogul Corp. v. United States*, 18 CIT ——, 862 F.Supp. 384 (1994). For unreviewed companies, the cash deposit rate established in the LTFV investigation becomes the assessment rate, which in turn becomes the rate for cash deposits of estimated duties for future entries for that company. *Federal–Mogul Corp.*, 17 CIT at ——, 822 F.Supp. at 788.

Accordingly, the Court finds that Commerce's assignment of the new "all others" rate established in this administrative review as the new cash deposit and assessment rates for unreviewed companies who had previously received the "all others" rate during the LTFV investigation is not in accordance with law. This case is remanded to Commerce to allow it to reinstate to unreviewed companies the "all others" cash deposit rate which was applied to unreviewed companies prior to these Final Results, provided that their entries have not become subject to assessment pursuant to a subsequent administrative review.

### 3. *Jilin's Foreign Inland Freight Costs*

▇ In its final determination, Commerce made a deduction for foreign inland freight for Jilin. Plaintiffs claim that, in calculating Jilin's foreign inland freight costs, Commerce erroneously employed a figure of 0.3107 instead of 0.03107 per kilogram of bearing. P.R. Document No. 159 at 1910. *Plaintiffs' Brief* at 45–48. Plaintiffs maintain that this ministerial error caused Commerce to overstate Jilin's freight costs. They request that the Court remand this issue to Commerce for correction of this error. *Id.*

Commerce concedes that it overstated Jilin's foreign inland freight costs due to an arithmetic error. It requests a remand to allow it to correct this ministerial error. *Defendant's Brief* at 31.

As this error is evident from the record at bar and is undisputed, the Court remands this issue to Commerce for elimination of the arithmetic error with regard to Jilin's foreign inland freight costs.

### 4. *CIF/FOB Ratio to Increase Indian Raw Material Costs*

Consistent with its determination that the PRC is an NME country, Commerce used a cost-of-production methodology to determine the foreign market value of TRBs produced in the PRC. *See* 19 U.S.C. § 1677b(c)(1) (1988). Commerce valued the factors of production for TRBs from the PRC by using the factors of production in a market economy country that it determined is of comparable economic development to the PRC and which produces comparable merchandise. 19 U.S.C. § 1677b(c). Commerce chose India as the most comparable surrogate. To value the different factors reported by the reviewed PRC companies in the cost of production, Commerce used publicly available information relating to India. In valuing the factors of production for TRBs, Commerce calculated the cost of steel used to make TRBs by using, as surrogate value, exports of steel from the European Community ("EC") to India. *Final Results*, 56 Fed.Reg. at 67,593. EC export statistics are based on FOB values rather than CIF values, therefore, Commerce converted the FOB price of the steel into a CIF price using a CIF/FOB conversion factor obtained from the International Monetary Fund's (IMF) International Financing Statistics for 1990. *Final Results*, 56 Fed.Reg. at 67,591.

Commerce argues that a CIF price reflects more closely what Indian producers actually paid for steel in the surrogate country. *Defendant's Brief* at 28–29.

Plaintiffs dispute Commerce's decision to include ocean freight costs in the calculation of steel costs claiming that Chinese TRB manufacturers, as a rule, do not import steel, purchasing it instead in the Chinese market. *Plaintiffs' Brief* at 48–49. Plaintiffs argue that the "purpose of NME surrogate calculations is to 'mirror' the experience of the NME exporter." *Id.* at 49. In addition, plaintiffs dispute Commerce's use of the IMF conversion ratio, arguing that its application increased Indian import prices by almost 12% although, generally, freight costs do not exceed 3% of the total unit price. *Id.* Plaintiffs claim that the U.S. import statistics' CIF/FOB ratio for steel bars of the type used by Chinese bearing manufacturers is only 1.029 and its application would have increased raw materials costs by only 2.9%. Plaintiffs contend that Commerce should have used the 1.029 ratio as BIA. *Id.* at 49–50.

The law prescribes special rules for determining foreign market value ("FMV") where Commerce has determined that the economy of a country from which the investigated merchandise is exported is state-controlled. Upon such a determination, Commerce "shall determine the foreign market value of the merchandise on the basis of the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1).

Title 19, United States Code, Section 1677b(c)(2) (1988) provides in relevant part:

If the administering authority finds that the available information is inadequate for purposes of determining the foreign market value of merchandise under paragraph (1), the administering authority shall determine the foreign market value on the basis of the price at which merchandise that is—

 . . . . .

(B) produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country,

is sold in other countries. . . .

In this case, Commerce chose India as the most comparable surrogate based on its per capita gross national product, its growth rate in per capita gross national product, and its national distribution of labor. *Final Results*, 56 Fed.Reg. at 67,591. Commerce's choice of India as a surrogate country was clearly in accordance with law. *See Tianjin Machinery*, 16 CIT at 938, 806 F.Supp. at 1016. Moreover, Commerce has discretion in interpreting the antidumping statute. *See Chevron v. U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Therefore, Commerce's use of surrogate country production values in this case was reasonable. Further, as Commerce used India as the surrogate country, its inclusion of freight costs incurred in Indian production, adjusted by the IMF ratio, is proper.

Accordingly, the Court affirms Commerce's Final Results with respect to the use of a CIF/FOB ratio to increase Indian raw material costs.

*Conclusion*

In accordance with the foregoing opinion, this case is remanded to Commerce to reinstate the "all others" cash deposit rate applicable prior to these Final Results for entries of unreviewed companies which have not become subject to assessment pursuant to a subsequent administrative review and to eliminate the arithmetic error with regard to Jilin's foreign inland freight costs.

Commerce's determination is affirmed in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Rebuttal comments are due within fifteen (15) days of the date responses or comments are due.