**PEER BEARING COMPANY, Plaintiff and Defendant–Intervenor,**

v.

**UNITED STATES, Defendant,**

**The Timken Company, Defendant–Intervenor and Plaintiff,**

**L & S Bearing Company, Luoyang Bearing Factory, Shanghai General Bearing Company, Ltd., Defendant–Intervenors.**

Slip Op. 98–70.
Court No. 97–01–00023.

United States Court of International Trade.

May 27, 1998.

448

Arent Fox Kintner Plotkin & Kahn (John M. Gurley and Peter L. Sultan), for Peer Bearing Company.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr. and Charles A. St. Charles), for Timken Company.

Frank W. Hunger, Asst. Atty. General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis, Asst. Director); of counsel: Rina Goldenberg, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

Cohen Darnell & Cohen (Mark A. Cohen), for L & S Bearing Company.

Graham & James LLP (Lawrence R. Walders and Andrea Fekkes Dynes), for Luoyang Bearing Factory.

Reed Smith Shaw & McClay (James K. Kearney and Priya Alagiri), for Shanghai General Bearing Company, Ltd.

### OPINION

TSOUCALAS, Senior Judge.

Plaintiffs Peer Bearing Company ("Peer") and the Timken Company ("Timken") have filed separate motions for judgment on the agency record pursuant to Rule 56.2 of this Court contesting various aspects of the final results of administrative reviews issued by Commerce regarding tapered roller bearings ("TRBs") imported from the People's Republic of China ("PRC").

### Background

This case deals with shipments of TRBs and parts thereof, finished and unfinished, from the People's Republic of China (PRC). On August 25, 1995, the Department of Commerce, International Trade Administration ("Commerce"), published the preliminary results of its administrative reviews of the antidumping duty order on TRBs from the PRC. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of Antidumping Duty Administrative Reviews* ("*Preliminary Results*"), 60 Fed.Reg. 44,302.

The administrative determination under review is *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of Antidumping Duty Administrative Reviews* ("*Final Results*"), 61 Fed.Reg. 65,527 (Dec. 13, 1996). The determination covers three periods of review ("PORs"): June 1, 1990 through May 31, 1991 (the fourth POR); June 1, 1991 through May 31, 1992 (the fifth POR); and June 1, 1992 through May 31, 1993 (the sixth POR).[1] The Court granted L & S Bearing Company's Motion to Intervene on March 17, 1997, after which L & S Bearing Company has not filed any additional papers. Oral argument was held at the Court on February 20, 1998.

### Discussion

This Court has jurisdiction in this case pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### A. Peer Bearing's Issues

#### 1. Selection of Partial BIA

Peer challenges only one issue pertaining to the Final Results. Specifically, Peer contests Commerce's choice of the best information available ("BIA") in its calculation of

---

**1.** The reviews were initiated prior to January 1, 1995. Consequently, the applicable law is the antidumping statute as it existed prior to the amendments made by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994). *See Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed.Cir.1995).

foreign market value ("FMV") for certain transactions in the fifth and sixth reviews.

Peer's related Hong Kong affiliate, Chin Jun Industrial Ltd.,[2] purchased TRBs from seven PRC suppliers and sold them to Peer, which then resold them to companies in the United States. Commerce requested that the seven PRC suppliers provide factors of production ("FOP") information for Commerce to use in calculating FMV. Five of the seven PRC suppliers did not provide the requested information. *Final Results,* 61 Fed.Reg. at 65,538, 65,542–43. Consequently, Commerce used BIA to determine the dumping margin for those U.S. sales of TRBs by the five non-responding PRC suppliers for the fifth and sixth review periods. *Id.* Commerce selected as BIA the 8.83% dumping margin that Commerce had assigned to Peer during the fourth POR.[3] Peer does not dispute that Commerce was required by statute to use BIA in making its determination. Rather, Peer challenges Commerce's selection of what constitutes partial BIA for the fifth and sixth reviews, arguing that the 8.83% rate Commerce used is punitive and improper. In addition, Peer asserts that, in light of its cooperation with Commerce and its inability to obtain the information Commerce requested from the non-responsive PRC suppliers, Commerce should have used a "neutral" methodology to determine the BIA rate, such as a weighted average of previous antidumping margins found for Peer, or actual dumping margins Commerce determined using the FOP information Peer was able to provide. Peer's Mem. Supp. Mot. J. Agency R. at 4–10.

Commerce responds that the 8.83% BIA rate was not punitive. Commerce asserts that the rate, which was the highest rate applicable to Peer in a previous review, was the most probative evidence of the current dumping margin. If it were not the most probative information, Commerce argues, Peer would have submitted information showing the margin to be less. Commerce's Partial Opp'n to Mots. J. Agency R. at 3.

Timken agrees with Commerce that the 8.83% BIA rate was not punitive and interprets Commerce's choice of BIA as the application of a "second-tier BIA rate" under Commerce's two-tier BIA methodology. Timken argues that this second-tier BIA rate is appropriate, even when factoring in Peer's cooperation. Timken's Opp'n to Mot. J. Agency R. at 2–5.

■ The statute expressly requires Commerce to use BIA when faced with a party that is unwilling *or unable* to participate in the administrative review proceedings. 19 U.S.C. § 1677e(c) (1988). However, because Congress did not define what constitutes BIA, Commerce's construction of the statute must be accorded considerable deference. *See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Commerce's selection of BIA is based on its interpretation of the governing statutory authority and regulatory provisions. The Court, therefore, must consider the scope of the statutory authority conferred upon Commerce regarding the use of BIA, Commerce's implementation of that authority through its regulations and Commerce's execution of its regulations through its articulated BIA policy. *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1189 (Fed.Cir.1993).

■ BIA "is not necessarily the most accurate information; rather, it is information that has become usable due to a respondent's failure to provide accurate information." *Usinor Sacilor v. United States,* 18 CIT 1155, 1161, 872 F.Supp. 1000, 1006 (1994); *Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT 13, 28, 704 F.Supp. 1114, 1126 (1989), *aff'd,* 901 F.2d 1089 (Fed.Cir.1990), *cert. denied, Floramerica, S.A. v. United States,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).

**2.** To clarify the record, this Court notes that in the Final Results Commerce refers to both Peer and Chin Jun Industrial Ltd. as "Chin Jun." 61 Fed.Reg. at 65,527–46. Because Peer is filing this action, however, this Court will refer to Peer and its affiliate collectively as "Peer."

**3.** Peer challenges the final results with respect to the fifth and sixth reviews but is not pursuing its appeal of the final results for the fourth review period. *See* Peer's Mem. Supp. Mot. J. Agency R. at 2.

The application of BIA may be "total" or "partial." Commerce applies total BIA when a party has failed to submit information in a timely manner, or when part of the submitted data is sufficiently flawed, rendering the entire response unreliable and unusable. *See Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 18 CIT 906, 915 n. 21, 865 F.Supp. 857, 865 n. 21 (1994), *aff'd*, 68 F.3d 487, 1995 WL 596834 (Fed.Cir.1995); *National Steel Corp. v. United States*, 18 CIT 1126, 1131, 870 F.Supp. 1130, 1135 (1994). When Commerce resorts to total BIA, Commerce implements a "two-tier BIA methodology," which factors in a party's cooperation in the BIA determination.[4] Commerce uses partial BIA when only part of the submitted information is deficient, but is still reliable in most other respects. *See Ad Hoc Comm.*, 18 CIT at 915 n. 21, 865 F.Supp. at 865 n. 21. The adversity of the information used as partial BIA depends on the level of sufficiency of the information provided. *National Steel*, 18 CIT at 1131, 870 F.Supp. at 1135.

■ Although Commerce expressly recognized Peer's cooperation in the Final Results, Commerce *does not* usually consider a party's level of cooperation when applying partial BIA. *See, e.g., AK Steel Corp. v. United States*, 21 CIT ——, ——, 988 F.Supp. 594, 607 n. 10 (1997) (according to Commerce's usual practice, a party's cooperation is not a factor Commerce considers in applying partial BIA); *see also National Steel*, 18 CIT at 1131, 870 F.Supp. at 1135 (Commerce does not consider the respondent's level of cooperation when applying partial BIA and may apply the highest non-abberant margin despite respondent's cooperation). Therefore, the *quality* and *completeness* of the data, and not Peer's cooperation, are the determining factors in establishing the appropriateness of the partial BIA rate. *National Steel*, 18 CIT at 1132, 870 F.Supp. at 1136.

■ Despite Commerce's statements in the Final Results unusually linking Peer's cooperation with Commerce's use of partial BIA, the Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). In this case, Commerce's partial BIA rate was based on a rate that had been the highest rate assigned to Peer in a preceding review, specifically, the fourth POR. In turn, the rate used in the fourth review was based on the rate applied to another Chinese producer in the *third* review. *See Final Results*, 61 Fed.Reg. at 65,545 n. 1.[5] Commerce, therefore, reasonably chose the unchallenged rate of the fourth review as a partial BIA rate in the fifth and sixth reviews. Com-

---

4. Despite Timken's argument that Commerce appropriately used second-tier BIA, Commerce's two-tier methodology is not invoked here. Only when applying total BIA does Commerce's two-tier methodology become relevant. This two-tier method of applying BIA distinguishes between parties that actively impede an investigation (assigned first-tier BIA) and parties who substantially cooperate with Commerce, but who nonetheless fail to provide the requested information (assigned second-tier BIA). *See Allied–Signal*, 996 F.2d at 1190. When Commerce uses first-tier BIA, Commerce employs the highest of the rates found for any firm for the same class or kind of merchandise in the same country of origin in the less than fair value ("LTFV") investigation, or the highest rate found in the current review for the same class or kind of merchandise in the same country of origin. When second-tier BIA is employed, Commerce assigns to a party the higher of its own prior LTFV rate or the highest rate calculated in the current administrative review. *Id.* at 1188.

5. The 8.83% BIA rate was an uncooperative rate in the fourth review. *Final Results*, 61 Fed.Reg. at 65,545 n. 1 ("[Chin Jun] did not respond to the questionnaire or did not respond to the supplemental questionnaire [in the fourth review]; therefore, as uncooperative BIA, [Commerce] assigned the highest rate calculated in the investigation or in this or any other review of sales of subject merchandise from the PRC."). However, the rate Commerce selected for certain U.S. sales is still partial BIA in the context of the fifth and sixth reviews because it was applied only for those sales for which no information was provided. *Id.* at 65,542.

The very nature of BIA and the ability to borrow rates from other reviews demonstrate that an uncooperative BIA rate in one review could be the cooperative second-tier rate in a subsequent review and a partial BIA rate in yet another review. In this case, for example, the rate used as partial BIA in the fifth and sixth reviews also could have been, for those same reviews, either a first-tier rate (the highest rate applied to any company) or a second-tier rate (the highest rate assigned to Peer).

merce's selection of the highest margin applicable to Peer (in the same review or in any review) as partial BIA for the U.S. sales for which Peer did not submit any information was reasonable and was in accordance with law.

■ The Court rejects Peer's argument that the partial BIA rate is punitive. Commerce would have had to reject low margin information in favor of demonstrably less probative high margin information for Commerce's use of BIA to be punitive. *See Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190 (Fed.Cir.1990). In this case, Commerce did not reject low margin information because Peer, by its own admission, had no information to submit. For the same reason, Peer's reliance on *Usinor* to support its claim that Commerce used an improper BIA methodology, is unfounded. In *Usinor,* the court found that Commerce erred in rejecting a company's verifiable sales data to use instead the highest non-aberrant margin, solely because the company failed to meet the preconditions for limited reporting. 18 CIT at 1161–62, 872 F.Supp. at 1006. In contrast, Peer was unable to obtain any verifiable sales data from those PRC suppliers to which partial BIA was applied.

Peer's reliance on *Holmes Prods. Corp. v. United States,* 16 CIT 628, 795 F.Supp. 1205 (1992), and *Flores,* 13 CIT 13, 704 F.Supp. 1114, to support its argument that Commerce should have applied a weighted-average margin is misplaced. In *Holmes,* the court held that Commerce erred in rejecting a company's data for certain calculations while using the company's data for other computations. 16 CIT at 631, 795 F.Supp. at 1207. Similarly, *Flores* stands for the principle that data estimates may be used where there is only a minimal failure in verified information. 13 CIT at 16, 704 F.Supp. at 1117–18. Finally, in *Shieldalloy Metallurgical Corp. v. United States,* also cited by plaintiff, the court held that:

> Commerce could not resort to adverse best information available because [plaintiff] complied with all information requests. (The statute clearly requires *noncompliance with an information request* before resort to the best information rule is justi-

fied, whether due to refusal or mere inability.) In the Remand Determination Commerce identifies evidence showing that [plaintiff] responded to all requests for information, and that all of [plaintiff's] responses were verified.

21 CIT ——, ——, 975 F.Supp. 361, 363 (1997) (emphasis in original) (citations omitted). In contrast, Peer simply did not submit any information regarding certain U.S. sales. Commerce therefore had the authority to resort to the highest rate assigned to Peer in a previous review as partial BIA for those sales.

### 2. *Amended BIA Rate*

As an argument of last resort, Peer contests that the 8.83% rate is incorrect because the rate was reduced by this Court to 7.07% in a previous opinion. Peer's Reply Mem. Supp. Mot. J. Agency R. at 14.

■ As a preliminary matter, the Court notes that although Peer has challenged Commerce's use of partial BIA in a timely fashion, the Court has not found any express challenges on the record referring to the amended rate. The Court is concerned that Peer raised the argument regarding the amended rate for the first time in its *Reply* Brief to this Court. Rule 81(1) of the Rules of this Court provides that a "reply brief shall be confined to rebutting matters contained in the brief of the respondent[s]," in this case, Timken and Commerce. "Nevertheless, the Court may exercise its discretion to prevent knowingly affirming a determination with errors." *Torrington Co. v. United States,* 1997 WL 589412, 21 CIT ——, ——, Slip Op. 97–136, at 7 (Sept. 19, 1997); *see also Toyota Motor Sales, U.S.A., Inc. v. United States,* 20 CIT ——, 930 F.Supp. 636, 639 (1996). Because the amendment of the rate is intimately related to Peer's timely challenge of the partial BIA rate, and because Commerce itself has already demonstrated its knowledge of the amendment in one of its redeterminations, the Court will exercise its discretion to consider this argument although it was not properly exhausted. *See, e.g., Mitsui & Co. v. United States,* 18 CIT 185, 194 (1994) (quoting *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)) (there may be exceptional circumstances which will prompt a reviewing

or appellate court to review arguments not raised in administrative proceedings where injustice may result by applying strictly the general rule of exhaustion). The Court finds that the present situation is an exceptional case that warrants judicial review.

 The antidumping duty rate of 8.83% was changed by this Court in *UCF America Inc. v. United States*, 18 CIT 1074, 870 F.Supp. 1120 (1994).[6] Commerce cannot use a rate that has been invalidated for BIA purposes. *D & L Supply Co. v. United States*, 113 F.3d 1220, 1223–24 (Fed.Cir. 1997); *Pulton Chain Co. v. United States*, 1997 WL 755135, 21 CIT ——, ——, Slip. Op. 97–162, at 7 (Dec. 2, 1997). It is irrational for Commerce to use a margin that has been invalidated because it ignores the interest in selecting a rate that has some relationship to commercial practices in the particular industry. *D & L* at 1224. The Court therefore finds that the use of the 8.83% rate is unrea-sonable and not supported by substantial evidence. Thus, in light of *UCF*, and in accordance with the Amended Redetermination of the third POR[7] from which the rate was taken, *Amended Redetermination*, 61 Fed. Reg. 29,345, this Court remands for Commerce to implement the amended BIA rate as required by *D & L*. Should Commerce determine that the 8.83% rate is appropriate despite the amendment in *UCF* and the corrected redetermination, the Court orders Commerce to distinguish the fifth and sixth PORs and explain why the amended rate should not be applied.

## B. *Timken's Issues*

1. *Commerce's Use of Indonesian Import Statistics and International Labor Organization Data as Surrogate Values for Certain FOPs to Determine FMV*

Commerce determined that TRBs from the PRC were being sold in the United States for

---

**6.** The Court cannot in this case ignore its own decision changing an obviously incorrect rate because the plaintiffs flouted proper procedure or because Commerce overlooked amendments to the record and its investigations. Although the Court is directed by statute to apply the exhaustion doctrine "where appropriate," 28 U.S.C. § 2637(d) (1994), the exhaustion requirement is not jurisdictional in nature, and can be bent under exceptional circumstances. *Mitsui*, 18 CIT at 186.

The amended rate of the third POR, on which Commerce based the dumping margin of the fourth, fifth and sixth PORs, is part of the record. The Court deems it significant that this Court's decision changing the rate and, more importantly, Commerce's amended redetermination applying the amended rate, were available to Commerce before the Final Results were published. *See UCF*, 18 CIT 1074, 870 F.Supp. 1120; *Final Results*, 61 Fed.Reg. at 65,527; *Final Court Decision and Amended Final Results: 1989–90 Administrative Review of Tapered Roller Bearings and Parts Thereof from the People's Republic of China ("Amended Redetermination")*, 61 Fed. Reg. 29,345 (June 10, 1996). The Court is unable to comprehend how Commerce could ignore the change of BIA in the third review after Commerce itself implemented the rate in a redetermination pursuant to Court remand.

Commerce's oversight is a significant factor in this Court's deviation from the exhaustion doctrine. The exhaustion doctrine protects the administrative process by prohibiting courts from considering issues not presented to the administrative agency. *See Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946) (holding that a reviewing court usurps the agency's function when it sets aside an administrative determination upon a ground not presented to the agency, depriving the agency of an opportunity to consider and rule on the matter). However, in this case, Commerce's preceding Amended Redetermination using the amended rate demonstrates that Commerce had the opportunity to consider the issue and that Commerce itself knowingly changed the antidumping margin in the POR from which it took the rate in question. Commerce had agreed that in the third POR it had made an error in calculating the dumping margin and asked for a remand. *UCF*, 18 CIT 1074, 870 F.Supp. 1120.

The Court further notes that a remand in this case is consistent with the purpose of the BIA statute which is to facilitate the determination of dumping margins *as accurately as possible*. *See D & L*, 113 F.3d at 1223.

**7.** The amended rate of the third review not only influences the fifth and sixth reviews, but also would inherently change the fourth review. This issue, however, is not presently before the Court. *See* Peer's Reply Mem. Supp. Mot. J. Agency R. at 2 ("Peer elected to accept BIA in the 1990–1991 [fourth] review because it had only *one very small U.S. sale* of TRBs in that review period, which did not warrant the effort and expense of verification for that review.") (emphasis in original); *see also* Peer's Mem. Supp. Mot. J. Agency R. at 2 (Peer no longer pursues its appeal of the final results in the fourth review). Due to Peer's deliberate failure to appeal the BIA rate implemented in the fourth POR, Peer is barred from raising this issue in the future.

LTFV and that these LTFV sales threatened the domestic industry with material injury. Because Commerce found that PRC is a nonmarket economy ("NME") country, Commerce calculated the FMV of the TRBs using CV and FOPs based on values from surrogate countries.

In the preliminary results, Commerce used values from Indian financial reports to determine three FOPs in calculating FMV: (1) overhead; (2) selling, general and administrative expenses ("SG & A"); and (3) profit. *Preliminary Results,* 60 Fed.Reg. at 44,305. For direct labor, Commerce used surrogate values derived from the International Labor Office's ("ILO") statistics and for material costs, Commerce used values from Indian import statistics. *Id.* Commerce included Indian material and labor expenses in the denominator of the calculation of percentages for factory overhead, SG & A and profit. *Id.*

In the Final Results, Commerce compared the Indian import data to U.S. import data and determined that the Indian data it used to value certain TRB components in the Preliminary Results was not reliable. 61 Fed. Reg. at 65,532. Commerce, therefore, chose to use India as a surrogate for steel used to produce rollers and cages and Indonesia as a secondary surrogate for cups and cones.[8] *Final Results,* 61 Fed.Reg. at 65,529–32. Commerce further determined that these surrogates comprised BIA for valuing raw material costs in its FOP calculations. *Id.*

Timken's arguments challenging Commerce's use of surrogate values are multifaceted. First, Timken argues that Commerce erred in determining that the Indian statistics were unreliable. Timken asserts that Commerce should have instead based the values of FOPs on Indian statistics as Commerce did in its preliminary determination. In the alternative, Timken argues that Commerce should have adjusted the Indian producer's overhead rate to correspond to the Indonesian and ILO FOPs Commerce used in the Final Results. Timken suggests that, at the very least, Commerce should

have deducted the amount of duties paid by the Indian producer on imported materials from the total overhead and SG & A calculations as an adjustment. Timken's Mem. Supp. Mot. J. Agency R. at 4–5, 13–29.

Defendant-intervenor Luoyang Bearing Factory ("Luoyang"), supports Commerce's position, arguing that Commerce has discretion to use data from a secondary surrogate country or other appropriate economy in antidumping proceedings involving a NME. In addition, Luoyang asserts that Commerce's use of U.S. import data for purposes of comparison was appropriate and reasonable. Luoyang's Opp'n to Mot. J. Agency R. at 11–14. Regarding adjustment, Luoyang argues that Commerce does not typically adjust its FOP calculations in the manner suggested by Timken. Luoyang's Opp'n to Mot. J. Agency R. at 22–28.

Peer agrees with Commerce's position that the Indian steel values were aberrational, necessitating the use of secondary surrogates. Peer also claims that no adjustment of Indian values was necessary because FMV in NME cases is often based on the application of ratios derived from one source to values derived from another. Last, Peer argues that Commerce correctly declined to adjust Indian overhead, SG & A and profit ratios for duties paid by the Indian producer on raw material imports because there was no evidence that such duties, if any, were included in the raw material costs. Peer's Opp'n to Mot. J. Agency R. at 7–18.

Shanghai General Bearing Company, Ltd. ("Shanghai") asserts that Commerce's use of Indonesian material factors and ILO rates with unadjusted Indian values was reasonable and was supported by substantial evidence on the record. Shanghai's Opp'n to Mot. J. Agency R. at 11–16.

■■■ There is no question that the PRC is a NME. When the merchandise under investigation is exported from a NME, 19 U.S.C. § 1677b(c) (1988) applies. The applicable provision states that when dealing with exports from NME countries, "the valuation of

---

**8.** A TRB consists of a cone (inner race), cage (roller retainer), and roller in one assembled unit, and the cup (outer race), which is the outer ring on which the rollers turn. *See, e.g., Tapered*

*Roller Bearings and Certain Components Thereof From Japan; Clarification of Scope of Antidumping Finding,* 46 Fed.Reg. 40,550, 40,551 (Aug. 10, 1981).

the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." *Id.* According to section 1677b(c)(3), the FOPs to be utilized in valuing merchandise from a NME include, but are not limited, to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." Section 1677b(c)(4) further provides that Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are (A) at a level of economic development comparable to that of the non-market economy country, and (B) significant producers of comparable merchandise." The Court finds that Commerce's use of unadjusted Indian values, integrated with Indonesian import values for bearing quality steel used to manufacture TRB cups and cones and ILO rates for direct labor values, is supported by substantial evidence and is in accordance with law.

■ Although Commerce expresses a strong preference for obtaining all factor values from a single surrogate source, both case law and Commerce's determinations are filled with instances in which Commerce used a blend of sources and surrogates to determine FMV. *Tianjin Mach. Import & Export Corp. v. United States,* 16 CIT 931, 940, 806 F.Supp. 1008, 1018 (1992) ("Commerce's ability to construct foreign market value from weighted alternatives advantageously serves the antidumping statutes purpose of 'determining current margins as accurately as possible.'"); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Partial–Extension Steel Drawer Slides with Rollers From the People's Republic of China,* 60 Fed.Reg. 54,472, 54,474 (Oct. 24, 1995) ("Although India is the preferred surrogate country, we have resorted to Indonesia for a certain surrogate value where an Indian value was determined to be inappropriate."); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China,* 59 Fed.Reg. 55,625, 55,629 (Nov. 8, 1994) (Commerce chose India as a primary surrogate market and relied mostly on Indian data, except for certain inputs). Nothing in the statute mandates that Commerce derive FMV from surrogate-based values according to a certain methodology. Section 1677b(c)(1) simply provides that "valuation of the factors of production shall be based on the best available information" regarding values in surrogate countries. Additionally, Commerce is to utilize the prices or costs in the surrogate country only to "the extent possible". *See Tianjin,* 16 CIT at 940, 806 F.Supp. at 1018. Commerce's authority to select appropriate surrogate values to determine FMV based on FOP includes the authority to do so without adjustment. The statute does not require Commerce to follow any single approach in evaluating FOP data. It was, therefore, within Commerce's authority to use India as a primary surrogate in conjunction with Indonesian values and ILO data as BIA for other values.

■ The Court rejects Timken's argument that Commerce erred in using the U.S. data as a benchmark to test the reliability of the Indian data. The Court has found in previous cases that comparison of surrogate data to U.S. data to determine reliability is within "Commerce's statutory authority and consistent with past practice." *See Writing Instrument Mfrs. Ass'n v. United States,* 21 CIT ——, ——, 984 F.Supp. 629, 639 (1997) (upholding use of U.S. benchmark as a point of comparison for two possible surrogate values); *see also Olympia Indus., Inc. v. United States,* 21 CIT ——, ——, Slip Op. 97–44, at 3–4, 1997 WL 181529 (Apr. 10, 1997) (upholding Commerce's use of data from other market economies to test the reliability of surrogate country data). Commerce, therefore, acted within its statutory authority by utilizing data from other market economies to aid its FOP valuation. *See* 19 U.S.C. § 1677b(c)(1) & (4). Timken's challenge of Commerce's decision to use Indonesian values for certain factors involves the correctness of Commerce's result, not Commerce's methodology, and so, is outside the Court's standard of review. *Writing Instrument,* 21 CIT at ——, 984 F.Supp. at 639. The Court

therefore concludes that Commerce's use of U.S. import data as a benchmark was reasonable.

■ The Court also rejects Timken's argument that Commerce's use of secondary surrogate values in the Final Results was without notice and, therefore, not in accordance with law. Commerce is allowed flexibility to change its position from the preliminary determination to the Final Results, as along as Commerce explains the basis for the change and the explanation is supported by substantial evidence. *See Asociacion Colombiana de Exportadores de Flores v. United States*, 22 CIT ——, ——, 6 F.Supp.2d 865, 879 (1998). Preliminary results, by their very nature, are preliminary and subject to change. *See, e.g., Tehnoimportexport v. United States*, 15 CIT 250, 254–255, 766 F.Supp. 1169, 1174–75 (1991) (affirming final determination where Commerce chose one country as surrogate in the preliminary results and then used another surrogate for the final determination). Commerce has no obligation to inform the parties that a different surrogate will be used in the final determination than in the preliminary. *See id.* 15 CIT at 255, 766 F.Supp. at 1175.

In the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable. The Court concludes that Commerce acted reasonably in applying surrogate values without adjustment in an attempt to capture the FMV of the PRC TRBs under review. In addition, Commerce acted reasonably by not deducting duties paid by the Indian producer on imported materials from the total overhead and SG & A calculations because Commerce had no evidence that such duties were paid.

### 2. *Adjustment of FMV by ESP Offset*

In the Final Results, Commerce deduced that the "other expenses" category in the Indian financial report, minus certain itemized debentures, were indirect selling expenses. Based on this conclusion, Commerce deducted the amount it determined to be indirect selling expenses from FMV. 61 Fed. Reg. at 65,535.

Timken recognizes that Commerce has the authority to deduct indirect selling expenses from FMV under 19 C.F.R. § 353.56(b)(2), but argues that Commerce's method of calculation was flawed and did not accurately determine such expenses. Timken asks for a remand so that Commerce could either eliminate the deduction from FMV or re-estimate what portion constitutes indirect selling expenses. Timken's Mem. Supp. Mot. J. Agency R. at 31–37.

Commerce responds it logically concluded that, after the subtraction of debentures, the other expenses category contained only indirect selling expenses for which an adjustment to FMV was appropriate. Commerce's Partial Opp'n to Mot. J. Agency R. at 41–45.

Peer agrees that Commerce reasonably assumed that the "other expenses" of the Indian producer were selling expenses that should be deducted from constructed value. Peer's Mem. Supp. Mot. J. Agency R. at 18–21.

Luoyang and Shanghai generally support Commerce's position and argue that Commerce's conclusion that other expenses minus debentures constitute indirect selling expenses was reasonable. Luoyang's Opp'n to Mot. J. Agency R. at 28–32; Shanghai's Opp'n to Mot. J. Agency R. at 22–25.

Exporter's sales price ("ESP") is "the price at which merchandise is sold or agreed to be sold in the United States." 19 U.S.C. § 1677a(c) (1988). Section 1677a(e)(2) provides that ESP shall be reduced by "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." Commerce's regulation, 19 C.F.R. § 353.56 (1994), permits a deduction from FMV, called an ESP offset, up to the amount of indirect selling expenses incurred in the United States. The ESP offset was

> created by Commerce, and approved by the courts, as a means to effect a fair comparison between foreign market value and United States price. Because the foreign market value allowance under § 1677b(a)(4)(B) for circumstances connected to the sale includes only direct selling expenses, while the statutory adjustment to exporter's sales price under

§ 1677a(e)(2) encompasses both direct and indirect selling expenses, Commerce was concerned that it would be unfair to compare foreign market value to United States price based on exporter's sales price. The ESP offset thus provides that when ... United States price is calculated using exporter's sales price, Commerce may reduce the foreign market value by the amount of indirect selling expenses incurred in making foreign sales.

*Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed.Cir.1996) (citations, quotations and footnotes omitted).

The Final Results indicate that Commerce adjusted the FMV of the surrogate pursuant to an ESP offset rationale. 61 Fed.Reg. at 65,535. The Indian producer's annual report from which Commerce borrowed figures did not itemize the expenses in the other expenses category. *Id.* The issue remaining is whether Commerce correctly applied 19 C.F.R. § 353.56 in adjusting the FMV of India's TRBs or, more specifically, whether Commerce correctly determined that the deductions made from the other expenses provided Commerce with an accurate number constituting indirect selling expenses to be deducted from FMV.

■ The Court holds that Commerce's determination that the other expenses category minus debentures constituted indirect selling expenses was not reasonable or supported by substantial evidence on the record. The other expenses category was the only item in a list of "expenses for manufacture, administration and selling" in the Indian producer's report that did not expressly cover manufacturing or administrative expenses. However, it does not necessarily follow that the remaining other expenses referred to selling expenses or, more specifically, to *indirect* selling expenses which may support an ESP offset adjustment. Consequently, the Court remands this issue to Commerce to employ a more accurate methodology for determining indirect selling expenses.

**3. *Commerce's Adjustments to USP for Inland Freight, Ocean Freight and Marine Insurance***

**a. *Inland Freight***

Timken argues that Commerce erred in its calculation of inland freight costs by assuming that rail rates were quoted per kilometer when in fact the rates were quoted per ton. Timken's Mem. Supp. Mot. J. Agency R. at 38. Commerce agrees with Timken that an error has occurred and requests a remand to recalculate inland freight on a "per kilometer" basis. Commerce's Partial Opp'n to Mot. J. Agency R. at 45.

Shanghai disputes that the inland freight calculation includes a clerical error, and alleges that Commerce intended to calculate inland freight based on kilometers. Shanghai further objects to a remand, claiming that Timken's argument regarding inland freight is time-barred because Timken did not raise the argument in the administrative proceedings. Shanghai's Opp'n to Mot. J. Agency. R. at 26–27. Luoyang echoes Shanghai's arguments that Timken's claim regarding inland freight rates is barred for lack of exhaustion. Luoyang's Opp'n to Mot. J. Agency R. at 33–34. Peer also argues that no clerical error occurred.[9]

■ Although this argument was not raised below, the Court gives great weight to the fact that Commerce admits it made an error and requests a remand. *See, e.g., E.I. DuPont de Nemours & Co. v. United States,* 22 CIT ——, ——, 4 F.Supp.2d 1248 (1998) (the Court deemed it significant that Commerce admitted an error and granted party's request for a remand despite party's failure to timely raise an issue below). The Court therefore grants Commerce's request to correct its clerical error in the inland freight calculation.

**b. *Ocean Freight***

■ In the Final Results, Commerce determined that the distance between India, the primary surrogate, and the United States

---

**9.** Peer's position that no clerical error occurred is based on a misunderstanding of Timken's argument. Peer incorrectly asserts the following: "Apparently, Timken believes that Commerce applied freight rates that were provided on a per ton basis, on a *per kilogram* basis." Peer's Opp'n to Mot. J. Agency R. at 21 (emphasis added). This is not Timken's argument.

is much greater than the distance between the PRC and the United States. The only other Asian country that approximates the distance between the PRC and the United States is Japan. Commerce therefore determined the Japan–United States ocean freight rate was the "best available information" upon which to value ocean freight. *Final Results,* 61 Fed.Reg. at 65,536.

Timken argues that Japan is not an appropriate surrogate for shipping rates. Timken asserts that Commerce should adjust the Japanese rates by increasing them 30% to account for the difference between Japanese costs and the higher Indian costs. To support its argument, Timken refers to information published by the International Monetary Fund comparing the value of merchandise on board the ship at the home country port (FOB) to the value of the merchandise with insurance and freight added (CIF). According to Timken, the CIF/FOB information shows that Indian freight costs are higher than Japanese costs. Timken's Mem. Supp. J. Agency R. at 38–41.

Peer, Shanghai and Luoyang generally agree with Commerce and argue that Commerce's use of Japanese rates as BIA was reasonable because the rates are market-economy rates and are a reasonable approximation of the distance from China to the United States. Peer's Opp'n to Mot. J. Agency R. at 22; Shanghai's Opp'n to Mot. J. Agency R. at 27–29; Luoyang's Opp'n to Mot. J. Agency R. at 34–36.

The Court affirms Commerce's choice of Japanese freight rates as a surrogate to PRC rates. Commerce reasonably determined that freight rates were greatly influenced by geographic proximity and, therefore, chose the surrogate which most closely approximated the distance between the PRC and the United States. Timken's suggested adjustment, on the other hand, is not supported by any evidence. The theoretical freight rates on which Timken relies have no relationship to the freight rates of TRBs in particular, but are instead based on generic rates of unspecified commodities. In addition, Timken's conclusion that Indian freight rates are higher than Japanese rates is based on the flawed assumption, evident in Timken's own argument, that Indian merchandise, compared with the value of Indian merchandise with freight *and insurance* added, reveal higher Indian freight costs. Thus, by Timken's own admission, there is at least one other factor, insurance rates, which may be responsible for higher Indian rates in certain situations.

### c. *Marine Insurance*

To estimate ocean insurance for the PRC's TRBs, Commerce applied an insurance rate based on weight applicable to sulfur dyes from India, the only publicly available insurance rate data. *Final Results,* 61 Fed.Reg. at 65,537.

Timken argues that Commerce unreasonably understated the insurance rate because the value of one ton of sulfur dye is much less than the value of one ton of TRBs. Timken asserts that payment for the loss or damage of one ton of sulfur dye would not have any relationship to the value of one ton of bearings. Timken's Mem. Supp. Mot. J. Agency R. at 41–43.

Peer asserts that the Final Results should be affirmed because Commerce did not have publicly available information in the record which would allow it to calculate surrogate values for ocean insurance more accurately than it already did. Peer's Opp'n to Mot. J. Agency R. at 22–23.

Luoyang argues that Commerce properly determined that the sulphur dyes marine insurance rate represented the best available information on the record. Luoyang's Opp'n to Mot. J. Agency R. at 36–38. Shanghai also supports Commerce's use of sulphur dye insurance rates. Shanghai's Opp'n to Mot. J. Agency R. at 30–32.

Commerce's selection of the sulfur dye rate resulted in a surrogate insurance premium for bearings that was based on weight. To justify its weight-based insurance methodology, Commerce argues that Timken failed to provide evidence of any other insurance premiums that are available in Asia based upon value. This, however, is not a sufficient reason to ignore the essence of insurance and the costs of insurance premiums paid by the insured. Insurance by defi-

nition is based upon pecuniary valuation, not on the weight of the product to be insured. *See, e.g.,* J. Kenneth Goodacre, Marine Insurance Claims 81–83 (2d ed.1981) (discussing the importance of valuation and identification of subject matter in marine insurance policies to indemnify the insured); William R. Vance, Handbook on the Law of Insurance 156 (3d ed.1951) (insurance provides indemnification for possible loss of a legal interest susceptible to pecuniary valuation). Further, Commerce does not dispute that its own source of public insurance rates regarding the weight of sulfur dyes was itself based on *value* of sulfur dyes per ton.

Both the value of TRBs and the risks involved in transporting them are considerably different from the value and risks involved in shipping sulfur dyes. This Court, therefore, remands for Commerce to determine marine insurance in a manner reasonably related to the value and risks of transporting TRBs.

### Conclusion

The Court remands to Commerce to assign the amended BIA margin to Peer or, in the alternative, to explain why the corrected rate should not be applied; to recalculate indirect selling expenses for the ESP offset; to recalculate marine insurance pursuant to a value-based methodology; and to correct the inland freight calculation. Commerce is affirmed in all other respects.

### *ORDER*

This case having been duly submitted for decision and the Court, after due delibera-

tion, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that the case is remanded to the Department of Commerce, International Trade Administration, to assign the amended BIA margin to Peer Bearing Company or, in the alternative, to explain why the amended rate should not be applied; and it is further

**ORDERED** that Commerce is to recalculate indirect selling expenses to be deducted from foreign market value for an exporter's sales price offset; and it is further

**ORDERED** that Commerce is to correct the inland freight calculation; and it is further

**ORDERED** that Commerce is to recalculate marine insurance according to a methodology based on the value of tapered roller bearings; and it is further

**ORDERED** that Commerce is affirmed in all other respects; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due.