**Slip Op. 99-73**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                                :
THE TIMKEN COMPANY,                             :
                                                :
          Plaintiff,                            :
                                                :
     v.                                         :    Court No. 97-03-00394
                                                :
UNITED STATES,                                  :
                                                :
          Defendant,                            :
                                                :
L & S BEARING COMPANY; PEER                     :
BEARING COMPANY; and SHANGHAI                   :
GENERAL BEARING COMPANY, LTD.,                  :
                                                :
          Defendant-Intervenors.                :
                                                :
_____         :


     Plaintiff, The Timken Company ("Timken"), moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results and Partial Termination of Antidumping Duty Administrative Review</u>, 62 Fed. Reg. 6,173 (Feb. 11, 1997).

     Timken claims that Commerce erred in: (1) selecting Indonesian, rather than Indian, import statistics for valuing the steel used by Chinese producers to manufacture cups and cones for tapered roller bearings ("TRBs"); (2) failing to adjust overhead, selling, general and administrative expenses ("SG&A"), and profit rates to account for differences in material and labor values of other surrogate sources used in determining foreign market value ("FMV"); (3) failing to deduct import duties paid by an Indian steel producer on raw-material imports which were included in the denominator of the overhead, SG&A, and profit ratios; (4) using Indian public labor data rather than an Indian steel producer's data as surrogate values for the direct-labor factor of production used to determine FMV of the TRBs; (5) selecting a certain Indian

tariff classification to value cold-rolled steel sheet used by Chinese producers to manufacture cages for TRBs; (6) including "purchases of traded goods" in an Indian steel producer's cost of manufacturing ("COM") when calculating the overhead, SG&A and profit rates; (7) failing to adjust United States price ("USP") for marine insurance costs based on value rather than weight; and (8) terminating the antidumping duty order for this administrative review with respect to defendant-intervenor Shanghai General Bearing Company, Ltd.

**Held:** Timken's motion for judgment on the agency record is granted in part and denied in part. Case is remanded to Commerce to: (1) further investigate and determine the appropriate measurement for valuing cold-rolled steel sheet used by Chinese producers to manufacture cages for TRBs; (2) exclude the "purchases of traded goods" from the COM used in the overhead, SG&A and profit-rate calculations; and (3) adjust USP by recalculating marine insurance pursuant to a value-based methodology. Commerce's final determination is affirmed in all other respects.

[Timken's motion is granted in part and denied in part. Case remanded.]

Dated: July 30, 1999

Stewart and Stewart (Terence P. Stewart, Mara M. Burr, James R. Cannon, Jr., Charles A. St. Charles and Amy S. Dwyer) for The Timken Company.

David W. Odgen, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Henry R. Felix); of counsel: Rina Goldenberg, Office of the Chief Counsel, for Import Administration, United States Department of Justice, for Defendant.

Cohen Darnell & Cohen, PLLC (Mark A. Cohen) for L & S Bearing Company.

Arent Fox Kintner Plotkin & Kahn, PLLC (John M. Gurley and Matthew J. McConkey) for Peer Bearing Company.

Reed Smith Shaw & McClay (James K. Kearney) for Shanghai General Bearing Company, Ltd.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiff, The Timken Company ("Timken"), moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results and Partial Termination of Antidumping Duty Administrative Review ("Final Results"), 62 Fed. Reg. 6,173 (Feb. 11, 1997).

## Background

The administrative review at issue concerns tapered roller bearings ("TRBs") and parts thereof, finished and unfinished, imported from the People's Republic of China ("PRC") during the eighth period of review covering June 1, 1994 through May 31, 1995.[1]  Commerce published the preliminary results of the subject review on August 5, 1996.  See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of Antidumping Administrative Review and

---

[1] Since the administrative review at issue was initiated prior to January 1, 1995, the applicable law is the antidumping statute as it existed prior to the amendments made by the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994).  See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

<u>Intent to Revoke Antidumping Duty Order in Part</u> ("Preliminary Results"), 61 Fed. Reg. 40,610. On February 11, 1997, Commerce published the Final Results at issue. <u>See</u> 62 Fed. Reg. 6,173. The Court granted L & S Bearing Company's Motion to Intervene on May 20, 1997, after which the company did not file any additional papers.

<u>Discussion</u>

The Court has jurisdiction in this case pursuant to 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final antidumping determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." <u>Timken Co. v. United States</u>, 12 CIT 955, 962, 699 F. Supp. 300, 306

(1988), aff'd, 894 F.2d 385 (Fed. Cir. 1990).


A.   Commerce's Selection of Indonesian Import Statistics as a Surrogate Value for Raw-Material Costs of Steel Used by Chinese Producers to Manufacture TRB Cups and Cones

In this case, Commerce determined that the TRBs from the PRC were being sold in the United States at a price less than what the foreign merchandise sells for in the home market, that is, being sold at less than its fair value ("LTFV"). Further, the International Trade Commission determined that these LFTV sales threatened the United States domestic industry producing the same merchandise with material injury. Because Commerce determined that the PRC is a non-market economy ("NME") country, Commerce calculated the foreign market value ("FMV") of the TRBs using the factors of production ("FOPs") based on values from surrogate countries pursuant to 19 U.S.C. § 1677b(c) (1988).

In the Preliminary Results, Commerce used data from a 1994-95 annual report ("Report") of SKF Bearings India, Ltd. ("SKF India"), a producer of similar merchandise in India, to determine the values of the following FOPs for calculating FMV: (1) overhead; (2) selling, general and administrative expenses ("SG&A"); and (3) profit. See 61 Fed. Reg. at 40,613. For the direct-labor factor, Commerce used surrogate values derived, with adjustments, from

Indian public labor data, <u>Investing, Licensing & Trading Conditions Abroad, India</u> ("IL&T"), published in November 1994 by the Economist Intelligence Unit. <u>See id.</u> For the raw-materials factor, Commerce used, with adjustments, Indian import statistics as the best information available ("BIA") for valuing the steel used by Chinese producers to manufacture the TRBs.[2] <u>See id.</u> (citing <u>Monthly Statistics of the Foreign Trade of India, Volume II--Imports</u>).

In the Final Results, Commerce determined that, contrary to its preliminary determination, the Indian import statistics were not reliable for valuing bearing-quality steel used to produce TRB cups and cones because (1) Commerce was unable to isolate an Indian import value for bearing-quality steel, and (2) Commerce found that the value of the Indian import data was significantly higher than (a) bearing-quality steel imported into the United States, and (b) similar European Union steel-import data.[3] <u>See</u> 62 Fed. Reg. at

---

[2] <u>See</u> <u>Tapered Roller Bearings and Certain Components Thereof From Japan;  Clarification of Scope of Antidumping Finding</u>, 46 Fed. Reg. 40,550, 40,551 (Aug. 10, 1981) ("A complete [TRB] consists of a cone or inner race, cage (roller retainer), and roller in one assembled unit, and the cup or outer race, which is the outer ring on which the rollers turn.").

[3] <u>See</u> Final Results, 62 Fed. Reg. at 6,180, n.1 (noting that while the European Union import data do not have the same bearing quality steel category as do the United States data, the European Union import data do provide narrative descriptions that closely match the chemical composition of the steel that the Chinese producers used to manufacture TRB cups and cones).

6,179-80. Commerce, therefore, selected India as a primary surrogate country for valuing steel used to produce TRB rollers and cages and Indonesia as a secondary surrogate country for valuing steel used to produce TRB cups and cones. See id. at 6,177, 6,180. Commerce further determined that these surrogates comprised the BIA for valuing raw-material costs in its FOPs calculations. See id. at 6,177.

In addition, in calculating the overhead, SG&A and profit-ratios, Commerce used data from SKF India's Report in both the numerators (SKF India's overhead, SG&A, and profit, respectively) and the denominator (the sum of SKF India's material and labor costs, that is, the total cost of manufacturing ("COM")). See id. at 6,178. Commerce noted that this methodology allowed it to derive internally consistent ratios of SKF India's overhead and SG&A expenses. See id. Commerce concluded that these ratios, when multiplied by the Indonesian and Indian raw-material costs and the IL&T labor data, constituted the BIA concerning overhead and SG&A expenses that would be incurred by a Chinese TRB producer given such FOPs. See id.

Timken's arguments challenging Commerce's use of surrogate values are multifaceted. First, Timken notes that Commerce's regulations and practices establish that surrogate values for FOPs

should be obtained from the primary surrogate country unless those values are unavailable or unreliable. See Pl.'s Mem. Supp. Mot. J. Agency R. at 23-26. Timken, therefore, asserts that since the Indian import statistics were reliable, Commerce erred in blending Indonesian with Indian import data to value the raw-materials factor. See id. at 26-29. In particular, Timken argues (1) that there were not sufficient differences between United States, Indonesian and Indian import prices to justify the use of Indonesian, rather than Indian, import data to value TRB cups and cones, see id., and (2) that Commerce's use of United States and European Union import data as benchmarks for assessing the reliability of the Indian import data was unreasonable, see id. at 30-32. Second, Timken claims that Commerce's selection of Indonesian import statistics in the Final Results was without notice to, or debate by, the parties, and thus, was arbitrary and unreasonable. See id. at 37-39. Third, Timken contends that the present case is distinguishable from the Federal Circuit's decision in Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442 (Fed. Cir. 1994), because Commerce has not articulated any legitimate policy for using Indonesian, rather than Indian, import data. See Pl.'s Mem. Supp. Mot. J. Agency R. at 39-40. Fourth, Timken argues that Commerce should have adjusted the overhead, SG&A, and profit rates, that is, reduced the COM denominator used in the calculation

of these rates to reflect the use of lower raw-material and labor values from separate sources (that is, Indonesian and Indian import statistics and IL&T labor data, respectively). See id. at 44-46. Fifth, Timken argues that Commerce should have made an adjustment for import duties paid by SKF India on raw-material imports which were included in the calculations of the overhead, SG&A, and profit ratios. See id. In the alternative, Timken argues if the Court determines that Commerce's use of SKF India's unadjusted overhead, SG&A and profit rates was reasonable, then Commerce should be required to use SKF India's raw-material and labor costs when calculating such rates because SKF India's data provides an internally consistent source and greater accuracy compared to using the Indonesian and Indian raw-material statistics and the IL&T labor data for calculating such rates. See id. at 47-50.

Peer Bearing Company ("Peer") agrees with Commerce's position that Indian import statistics were an unreliable surrogate for valuing TRB cups and cones, necessitating the use of secondary surrogate values from Indonesia. See Peer's Resp. to Mot. J. Agency R. at 9-13. Peer asserts that Timken was not prejudiced by Commerce's use of Indonesian import data in the Final Results because Commerce released a memorandum to all parties in this review that listed five surrogate countries, and included Indonesia

as a surrogate country. See id. at 12. Peer also claims that no adjustment of SKF India's overhead, SG&A and profit rates was necessary because Commerce's entire methodology for determining FMV in NME cases often is based on the application of ratios derived from one source to values derived from another. See id. at 15. Peer further argues that Commerce properly declined to deduct the import duties paid by SKF India on raw-material imports, that are included in the denominator of the overhead, SG&A and profit ratios, because, as Commerce noted in the Final Results, see 62 Fed. Reg. at 6,178, there was no evidence that such duties were paid. See Peer's Resp. to Mot. J. Agency R. at 15-16. Last, Peer argues that Commerce's use of SKF India's overhead, SG&A and profit rates does not require that Commerce use SKF India's material and labor costs because for each factor Commerce correctly selected the surrogate values which constituted the BIA. See id. at 16-17.

There is no question that the PRC is a NME. When the foreign merchandise under investigation is exported from a NME, 19 U.S.C. § 1677b(c) applies. Section 1677b(c) provides that when dealing with exports from NME countries, such as the PRC, the valuation of the FOPs is based on the BIA regarding the values of such factors in a market economy country or countries considered to be appropriate by Commerce. See 19 U.S.C. § 1677b(c)(1). The FOPs

"include, but are not limited to--(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." Id. § 1677b(c)(3). In valuing these FOPs, the statute provides that Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are--(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." Id. § 1677b(c)(4).

The Court finds that Commerce's (1) selection of Indonesian, rather than Indian, import data to value steel used to manufacture TRB cups and cones, (2) use of SKF India's overhead, SG&A and profit rates without adjustment, (3) refusal to deduct alleged import duties paid by SKF India on raw-material imports, and (4) use of IL&T labor data to value the direct-labor factor, are supported by substantial evidence and in accordance with law.

"Although Commerce expresses a strong preference for obtaining all factors values from a single surrogate source, both case law and Commerce's determinations are filled with instances in which Commerce used a blend of sources and surrogates to determine FMV." Peer Bearing Co. v. United States, 22 CIT __, __, 12 F. Supp. 2d

445, 455 (1998) (citing <u>Tianjin Mach. Import & Export Corp. v. United States</u>, 16 CIT 931, 940, 806 F. Supp. 1008, 1018 (1992) ("Commerce's ability to construct [FMV] from weighted alternatives advantageously serves the antidumping statutes purpose of 'determining current margins as accurately as possible.'"); <u>Notice of Final Determination of Sales at Less Than Fair Value: Certain Partial-Extension Steel Drawer Slides with Rollers From the People's Republic of China</u>, 60 Fed. Reg. 54,472, 54,474 (Oct. 24, 1995) ("Although India is the preferred surrogate country, we have resorted to Indonesia for a certain surrogate value where an Indian value was determined to be inappropriate.")), <u>remand results aff'd</u>, 22 CIT __, Slip Op. 98-161 (Dec. 7, 1998), <u>appeal docketed</u>, <u>Timken Co. v. United States</u>, No. 99-1204 (Fed. Cir. 1999).  Nothing in the antidumping statute or its legislative history mandates that Commerce must derive FMV from surrogate-based values according to a certain methodology.  <u>See</u>  <u>Tianjin</u>, 16 CIT at 940, 806 F. Supp. at 1018.  Rather, § 1677b(c)(1) "provides simply that 'valuation of the factors of production shall be based on the <u>best available information</u>' regarding values in a surrogate country.  Additionally, Commerce shall only utilize 'to the extent possible' the prices or costs in the surrogate country." <u>See id.</u> (citation omitted).  "Commerce's authority to select appropriate surrogate values to determine FMV based on FOP includes the authority  to  do

so without adjustment." <u>Peer Bearing</u>, 22 CIT at __, 12 F. Supp. 2d at 455. Indeed, "[t]he statute does not require Commerce to follow any single approach in evaluating data." <u>Olympia Indus., Inc. v. United States</u>, 21 CIT __, __, Slip Op. 97-44, at 11 (Apr. 10, 1997) (citing <u>Lasko</u>, 43 F.3d at 1446). It was, therefore, within Commerce's authority to use India as a primary surrogate in conjunction with Indonesian values and IL&T labor data as the BIA for other values, without making any adjustment to SKF India's overhead, SG&A and profit rates.

The Court rejects Timken's assertion that Commerce erred in using United States and European Union data as benchmarks to test the reliability of the Indian import data for valuing TRB cups and cones. The Court has found in prior cases that comparing surrogate data to market economy data to determine the reliability of such surrogate data is within "'Commerce's statutory authority and consistent with past practice.'" <u>Peer Bearing</u>, 22 CIT at __, 12 F. Supp. 2d at 455 (quoting <u>Writing Instrument Mfrs. Ass'n v. United States</u>, 21 CIT __, __, 984 F. Supp. 629, 639 (1997) (upholding use of United States benchmark as a point of comparison for two possible surrogate values) (quoting, in turn, <u>Olympia Indus., Inc.</u>, 21 CIT at __, Slip Op. 97-44, at 12 (upholding Commerce's use of data from other market economies to test the reliability of

surrogate country data))).  Commerce, therefore, acted within its statutory authority by utilizing United States and European Union data to aid in its FOPs valuation.  See id. (citing 19 U.S.C. § 1677b(c)(1), (4)).  With respect to Timken's challenge to Commerce's decision to use Indonesian over Indian values for TRB cups and cones, the Court finds that Timken is assailing the correctness of of Commerce's result, not Commerce's methodology, which is outside the Court's standard of review.  See Writing Instrument, 21 CIT at __, 984 F. Supp. at 639.  The Court, therefore, concludes that Commerce's use of data from other market economies as benchmarks to test the reliability of the Indian import data was reasonable.

The Court also rejects Timken's argument that Commerce's use of Indonesian surrogate values in the Final Results was without notice to Timken and, therefore, was arbitrary and unreasonable. "Commerce has the flexibility to change its position" from the preliminary to the final results, as long as Commerce explains "the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence." Asociacion Colombiana de Exportadores de Flores v. United States, 22 CIT __, __, 6 F. Supp. 2d 865, 879-80 (1998).  Moreover, "[p]reliminary results, by their very nature, are preliminary and

subject to change. Commerce has no obligation to inform the parties that a different surrogate will be used in the final determination than in the preliminary." <u>Peer Bearing</u>, 22 CIT at __, 12 F. Supp. 2d at 456 (citing <u>Tehnoimportexport v. United States</u>, 15 CIT 250, 254-55, 766 F. Supp. 1169, 1174-75 (1991) (affirming final determination where Commerce chose one country as surrogate in the preliminary results and then used another surrogate for the final determination)).

The Court also rejects Timken's argument that Commerce's use of Indonesian import statistics is distinguishable from the Federal Circuit's decision in <u>Lasko</u>. <u>See</u> Pl.'s Mem. Supp. Mot. J. Agency R. at 39-40. In <u>Lasko</u>, the court considered whether or not § 1677b of the antidumping statute permits Commerce to determine FOPs using both surrogate country values and actual cost values and concluded that there was no error in Commerce's methodology of using both values. <u>See</u> 43 F.3d at 1445-46. The court opined that "[w]here we can determine that a NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices," and, "[t]herefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the [antidumping statute]" of determining dumping margins "as accurately as possible." <u>Id.</u> at 1446 (internal

quotation marks and citations omitted).  But the court noted that "[i]n situations in which a statute does not compel a single understanding, . . . our duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute."  Id. (internal quotation marks and citation omitted).

Timken asserts that, unlike Lasko, Commerce has not explained any "legitimate policy" served in this case by using Indonesian import data or rejecting Indian information.  See Pl.'s Mem. Supp. Mot. J. Agency R. at 40.  Specifically, Timken asserts that (1) the Indian, rather Indonesian, import data was more reliable as an indicator of bearing steel prices, and (2) Commerce's use of the Indonesian import data, because it was closer to United States import values than Indian data, was not a policy choice; rather, it was based on a faulty premise that Indian steel costs should approximate United States steel costs.  See id.

Because the Court rejected these arguments above, the Court finds that Timken has otherwise failed to demonstrate how this case is distinguishable from Lasko.  Moreover, the Court notes that Lasko supports Commerce's methodology of using both Indian and Indonesian import data to value the raw-materials factor.  See

Lasko, 43 F.3d at 1445-46.

In the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable. The Court concludes that Commerce acted reasonably in applying surrogate values without adjustment in an attempt to capture the FMV of the PRC TRBs under review. Commerce also acted reasonably by not deducting import duties paid by SKF India on raw-material imports from the calculations of overhead, SG&A and profit rates because Commerce had no evidence as to the amount of duties, if any, that were included in SKF India's raw-material costs.

B.  Commerce's Selection of Tariff Classification 7209.42.00 to Value Cold-Rolled Steel Used to Produce TRB Cages

In both the Preliminary and Final Results, Commerce used Indian tariff classification 7209.42.00 to value cold-rolled steel sheet used by Chinese producers to manufacture cages for TRBs. See Final Results, 62 Fed. Reg. at 6,180.  Timken objected to Commerce's use of this tariff subheading because it does not specify "carbon content," an essential characteristic that Chinese producers detailed in their descriptions of the cold-rolled steel sheet they used to manufacture TRB cages. See id.  Timken, therefore, suggested Indian tariff classification 7211.41.00 because it more closely resembled the carbon content of the cold-

rolled steel sheet. See id. In response, Chinese producers argued that although tariff subheading 7211.41.00 lists carbon content, it was not an appropriate subheading for valuing cold-rolled steel sheet used for TRB cages because the subheading does not separate out ranges of thickness for such steel. See id. Rather, subheading 7211.41.00 covers all such steel that is greater than 600 mm, while subheading 7209.42.00 has more defined boundaries for the thickness of such steel, that is, between 0 and 600 mm. See id. Commerce rejected Timken's suggestion based on the grounds that subheading 7211.41.00 covered "hot-rolled" steel sheet and, therefore, was not an appropriate category for valuing "cold-rolled" steel sheet used to produce TRB cages. See id.

Timken requests that if the Court affirms Commerce's use of Indian import statistics rather than SKF India's Report to value steel, then the Court should instruct Commerce to use Indian tariff subheading 7211.41.00. See Pl.'s Mem. Supp. Mot. J. Agency R. at 42. This subheading describes the specific carbon content of steel used to manufacture TRB cages in the PRC, compared to subheading 7209.42.00, which does not distinguish among the carbon content levels. See id.

Peer asserts that although Indian tariff subheading 7211.41.00 specifies carbon content, Timken's argument is flawed because

subheading 7209.42.00 is more specific in other respects.  See
Peer's Resp. to Mot. J. Agency R. at 17.  In particular, Peer notes
that subheading 7209.42.00 more accurately describes the thickness
of the steel used to produce TRB cages.  See id.  Peer, therefore,
contends that Commerce's selection of subheading 7209.42.00 to
value steel used to produce TRB cages was reasonable.  See id.

Commerce agrees that Timken's suggested Indian tariff
subheading 7211.41.00 does cover cold-rolled steel sheet and the
appropriate carbon content.  See Def.'s Mem. Opp'n to Mot. J.
Agency R. at 25.  Nevertheless, Commerce contends, as the Chinese
producers indicated in the Final Results, see 62 Fed. Reg. at
6,180, that this subheading does not separate out ranges of
thickness for such steel; rather, the category covers all cold-
rolled steel sheet (with an appropriate carbon content) that is
thicker than 600 mm.  See Def.'s Mem. Opp'n to Mot. J. Agency R. at
25.  Thus, Commerce asserts that the available cold-rolled steel
sheet categories are divided into very thin sheets or very thick
sheets with the appropriate carbon content.  See id.  Based on the
current record, Commerce claims that it cannot determine what the
average thickness is for the cold-rolled steel sheet that the
Chinese producers used to produce TRB cages.  See id.  Commerce
further contends that if subheading 7211.41.00 does not include the

appropriate thickness, it cannot determine which of the two factors--thickness or carbon content of steel sheet--would be a more appropriate measurement for this particular raw material. See id. Commerce, therefore, requests that the issue be remanded for further investigation and a determination based on additional facts. See id.

The Court agrees with Timken that Indian tariff subheading 7211.41.00 does cover cold-rolled steel sheet and the appropriate carbon content. The Court, however, remands this issue to Commerce to further investigate and determine the appropriate measurement for valuing cold-rolled steel sheet that Chinese producers used to manufacture TRB cages.

C.    Commerce's Inclusion of "Purchases of Traded Goods" in SKF India's Costs of Materials

In the Final Results, Commerce designated the line item "purchases of traded goods" in SKF India's Report as a material cost to be included in the COM that was used as the denominator of the overhead, SG&A, and profit-rate calculations. See 62 Fed. Reg. at 6,182. Timken noted that SKF India's Report identified these "traded goods" as "ball and roller bearings, bearing accessories and maintenance products, and textile machinery components." Id. (internal quotation marks omitted).

Timken asserts that the "purchases of traded goods" should be excluded from the COM denominator used in the overhead, SG&A and profit-rate calculations. See Pl.'s Mem. Supp. Mot. J. Agency R. at 50-51. Timken notes, as it did for the Final Results, see 62 Fed. Reg. at 6,182, that SKF India's Report separated "purchases of traded goods" from raw materials and bought out components consumed and, in another section of the Report, segregated them from goods SKF India manufactured and sold during the year. See Pl.'s Mem. Supp. Mot. J. Agency R. at 51. Timken further notes that in previous reviews Commerce included only steel costs in the cost of materials, but not finished products. See id. at 51. Since the "traded goods" are products that are purchased and sold by SKF India, and since they are already manufactured and do not affect production, Timken contends that the "traded goods" are not overhead or SG&A and are not material costs used in producing the subject merchandise. See id. at 50-51; see also Pl.'s Reply Mem. Supp. Mot. J. Agency R. at 20. Timken, therefore, requests that the Court remand the issue to Commerce to exclude the "purchases of traded goods" from the overhead, SG&A and profit-rate calculations. See Pl.'s Mem. Supp. Mot. J. Agency R. at 51.

Commerce responds, as it did in the Final Results, see 62 Fed. Reg. at 6,183, that in past reviews it did not include a line item

for "purchases of traded goods" in the COM denominator because in previous reviews the SKF India reports, unlike the Report in this review, did not include a separate line item for such goods, see Def.'s Mem. Opp'n to Mot. J. Agency R. at 34.  Commerce contends that it included the line item for "trade goods" because it concluded they were not overhead and SG&A expenses, but instead reflected the costs associated with the production of merchandise. See id. at 33.  Commerce asserts that it made this determination based on the description of the "purchases of traded goods" in SKF India's Report as the purchase of finished and semi-finished goods required to meet SKF India's clients' demands.  See id.  Commerce notes that SKF India did not incur direct materials or direct labor expenses for such "trade goods"; rather, it incurred the expense of purchasing them.  See id.  Because the "purchases of traded goods" are included in the calculation of the costs of goods sold, Commerce claims that they are ordinary business expenses.  See id. Commerce, therefore, argues it acted reasonably and in accordance with law by including the "purchases of traded goods" as part of the COM denominator it used in the overhead, SG&A, and profit-rate calculations.  See id. at 34.

Peer agrees with the position taken by Commerce, arguing that since the "purchases of traded goods" are semi-finished or finished

goods, that is, the type of items which are routinely purchased by bearing manufacturers, they are material costs and, therefore, should not be excluded from SKF India's costs of materials. <u>See</u> Peer's Resp. to Mot. J. Agency R. at 16.

The Court disagrees with Commerce's determination. Although SKF India's Report stated that the "purchases of traded goods" were required to meet SKF India's clients' demands, Commerce failed to demonstrate how these already manufactured goods constitute a material cost incurred in manufacturing the subject merchandise. The Court, therefore, remands this issue to Commerce to exclude the "purchases of traded goods" from the COM used in the denominator of the overhead, SG&A, and profit-rate calculations.

D.   <u>Commerce's Adjustment to USP for Marine Insurance</u>

In the Final Results, Commerce made an adjustment to USP for marine-insurance expense, that was incurred for shipping the Chinese producers' TRBs to the United States, by selecting a surrogate marine-insurance rate based on weight (that is, per ton) applicable to sulfur dyes shipped from India. <u>See</u> 62 Fed. Reg. at 6,185. Commerce decided to use this insurance rate based on weight because it was the only publicly available information and it had used the same rate repeatedly for other PRC analyses. <u>See id.</u>

Timken contends that Commerce unreasonably understated the marine-insurance expense by applying a surrogate marine-insurance rate on a per ton basis applicable to sulfur dyes from India. See Pl.'s Mem. Supp. Mot. J. Agency R. at 52. Timken argues that the rate should be based upon value rather than upon weight of the merchandise insured, reasoning that if a container of TRBs were lost at sea, there is no basis for the conclusion that an insurance payment for the loss of one ton of sulfur dye would have any relationship to the value of the loss of one ton of TRBs. See id. Thus, Timken suggests, as it did in the Final Results, see 62 Fed. Reg. at 6,185, that Commerce calculate a marine-insurance rate based upon the ratio of the insurance charged per ton of sulphur dye divided by the value of the sulfur dye per ton (based on United States Customs, rather than sales, value) and apply this factor to the price of TRBs sold in the United States, see Pl.'s Mem. Supp. Mot. J. Agency R. at 52.

Peer argues that the Final Results should be affirmed because Commerce did not have publicly available information in the record which would allow it to calculate surrogate values for marine insurance any more accurately than it did. See Peer's Resp. to Mot. J. Agency R. at 18. Peer also emphasizes that value is not the only basis for setting an insurance rate. See id.

To justify its weight-based marine-insurance rate, Commerce argues that Timken failed to provide evidence of any other insurance premiums that are available in Asia based upon value. See Def.'s Mem. Opp'n to Mot. J. Agency R. at 35. "This, however, is not a sufficient reason to ignore the essence of insurance and the costs of insurance premiums paid by the insured. Insurance by definition is based upon pecuniary valuation, not on the weight of the product to be insured." Peer Bearing, 22 CIT at __, 12 F. Supp. 2d at 458-59 (citing J. Kenneth Goodacre, Marine Insurance Claims 81-83 (2d ed. 1981) (discussing the importance of valuation and identification of subject matter in marine insurance policies to indemnify the insured); William R. Vance, Handbook on the Law of Insurance 156 (3d ed. 1951) (insurance provides indemnification for possible loss of a legal interest susceptible to pecuniary valuation)).

The Court finds that both the value of TRBs and the risks involved in transporting them are considerably different from the value and risks involved in shipping sulfur dyes. The Court, therefore, remands this issue to Commerce to adjust USP by recalculating the marine-insurance expense using a methodology reasonably related to the value and risks of transporting TRBs.

E.    Revocation of Shanghai's Antidumping Order

In two actions, Timken is challenging the final results of the four administrative reviews that preceded this eighth review.  See Peer Bearing, 22 CIT at __, 12 F. Supp. 2d at 449 (covering the fourth, fifth and sixth reviews from June 1, 1990 through May 31, 1993); Timken Co. v. United States, Consol. Ct. No. 97-03-00419 (covering the seventh review from June 1, 1993 through May 31, 1994).  In the final results of the seventh review, see Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of Antidumping Duty Administrative Review and Revocation in Part of Antidumping Duty Order 62 Fed. Reg. 6,189 (Feb. 11, 1997), Commerce revoked the antidumping duty order as to Shanghai General Bearing Company, Ltd. ("Shanghai"), a Chinese TRB producer, see id. at 6,214, and based on that revocation, Commerce terminated the order for this review as to Shanghai, see Final Results, 62 Fed. Reg. at 6,173.

Timken asserts that the results of those two prior actions are expected to increase the antidumping margins for Shanghai, and this will thus require that the antidumping duty order be reinstated as to Shanghai.  See Pl.'s Mem. Supp. Mot. J. Agency R. at 55. Timken, therefore, requests that the Court order Commerce to resume the antidumping review of Shanghai for this review.  See id.; Pl.'s

Reply Mem. Supp. Mot. J. Agency R. at 23.

Commerce argues that its revocation of the antidumping duty order in the seventh review was proper and should be sustained. See Def.'s Mem. Opp'n to Mot. J. Agency R. at 35. Shanghai agrees with the position taken by Commerce. See Shanghai's Mem. Opp'n to Mot. J. Agency R. at 4. All parties' arguments regarding the revocation are set forth in the briefs for the second action covering the seventh review. See Timken, Consol. Ct. No. 97-03-00419.

Since the parties' arguments regarding Commerce's revocation of the antidumping duty order as to Shanghai are only presented in the action concerning the seventh review, see id., and since the merits of that action have not been reviewed by this Court nor have the merits of the first action on appeal been adjudicated, we decline to address Commerce's revocation decision. Accordingly, we find no basis for reinstating the order as to Shanghai for this review.

Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) further investigate and determine the appropriate measurement for valuing cold-rolled steel sheet that

Chinese producers used to manufacture TRB cages; (2) exclude the "purchases of traded goods" from the COM used in the denominator of the overhead, SG&A and profit-rate calculations; and (3) adjust USP by recalculating marine insurance pursuant to a value-based methodology. Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     July 30, 1999
           New York, New York